### In re EXECUTIVE TELECARD, LTD. SECURITIES LITIGATION.

### No. 94 CIV. 7846(CLB).

United States District Court, S.D. New York.

Oct. 16, 1997.

---

James G. Flynn, Wechsler, Harwood, Halebian & Feffer, New York City, for plaintiff.

Steven Altman, Ziegler, Ziegler & Altman, New York City, for defendant Executive Telecard, Robert Schuck, Estate of C.C. Duncan and Allen Mandel.

Dan L. Goldwasser, Vedder, Price, Kaufman, Kammholz & Day, New York City, for defendant Goldstein, Karlewicz & Goldstein.

Stephen Altman, Richard Emery, P.C., New York City, for defendant Edward J. Garrity, Jr.

Leon Friedman, New York City, for defendant Network Data Systems William Moore.

Manta and Welge, Philadelphia, PA, for defendant Carl J. Corcoran.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

This class action under Section 10(b) of the securities Exchange Act of 1934 arises out of the purchase of the common stock of Executive Telecard, Ltd. ("EXTL") by a class of investors that bought EXTL at allegedly inflated prices (the "Class") during the period of October 28, 1991, through October 27, 1994 (the "Class Period"). Plaintiffs in this fraud on the market case allege that (1) the defendants, including EXTL and several of its officers and directors and related entities, misrepresented and/or omitted various mate-rial facts regarding EXTL's operations and financial condition throughout the Class Period; and (2) defendants failed to disclose that an incarcerated felon with a history of securities violations, Mr. Richard O. Bertoli, was dispensing corporate advice to the Company through its directors and officers (for convenience, EXTL management's alleged entanglement with Mr. Bertoli is referred to hereinafter as "the Bertoli connection").

Presently before this Court is (1) defendants' motion to exclude the testimony at trial of plaintiffs' damages expert (hereinafter, the "Expert Witness"); (2) defendants' motion for summary judgment, pursuant to Fed.R.Civ.P. 56; and (3) plaintiffs' cross motion for partial summary judgment on the issue of the materiality of the defendants' alleged omission of the Bertoli connection.

## Discussion

### A. Defendants' Motions

The Defendants seek to exclude the testimony of plaintiffs' Expert Witness on the ground that it is insufficiently reliable to be admissible at trial. Defendants also move for summary judgment because in the absence of that expert testimony, plaintiffs would be unable to prove the requisite element of damages—a failure that would be fatal to their claim. Each of these contentions is examined in turn below.

#### 1. The Challenge to Plaintiffs' Expert Witness

##### (a) Rule 702 Standards

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert testimony, provides that:

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In arguing over the admissibility of the proposed expert testimony, both parties invoke the specific factors enumerated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct.

2786, 125 L.Ed.2d 469 (1993). Those factors are the ability to be tested, peer review and publication, potential rate of error, and general acceptance in the scientific community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97.

Such factors appear, however, to be applicable only to the "scientific . . . knowledge" testimony covered by Rule 702. *Daubert* turned on very specific medical and statistical issues in the area of disease causation—namely, a challenge to expert testimony on the question of whether prenatal ingestion of the prescription drug Bendectin was a risk factor for certain human birth defects. 509 U.S. at 579, 113 S.Ct. at 2789–90. Thus, the *Daubert* Court appears to have limited its specific guidance—i.e., the enumerated factors noted above—to the scientific testimony before it, and not to the "technical, or other specialized knowledge" testimony independently covered by Rule 702. As the Court itself noted "[o]ur discussion is limited to the scientific context because that is the nature of the expertise offered here." 509 U.S. at 590 n. 8, 113 S.Ct. at 2795 n. 8; *see also United States v. Starzecpyzel,* 880 F.Supp. 1027, 1038–41 (S.D.N.Y.1995) (discussing the reach of the *Daubert* opinion in detail).

The valuation of damages in a securities class action such as this does not appear to be the sort of "hard science" that requires application of the specific factors set forth by *Daubert.* We are guided, nonetheless, by the *Daubert* Court's more general instruction that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 594–95, 113 S.Ct. at 2797. In other words, an expert's opinion should at least "have a reliable basis in the knowledge and experience" of the particular "discipline" involved. 509 U.S. at 592, 113 S.Ct. at 2796.

Accordingly, in evaluating the admissibility of plaintiffs' Expert Witness' testimony on Class damages under Rule 702, our focus must be on the reliability of the principles and methodologies used.

**(i) *Plaintiffs' Expert Witness' Original Damages Report***

■ In preparation for this litigation, plaintiffs retained the services of the Expert Witness, an experienced Registered Investment Advisor, Securities Analyst and Registered Representative. In December 1996, pursuant to this Court's order, plaintiffs submitted the Expert Witness' report on the damages incurred by the Class as a result of defendants' alleged fraud (the "Original Report"). *See* Def. Exh. 13. In that Report, the Expert Witness measured the alleged Class damages by comparing EXTL's actual historical stock price during the Class Period, to what he determined to be the stock's "true value", e.g., the price he determined the stock would have traded at absent the alleged fraud. *Id.* at ¶¶ 9–13. In determining the period by which to measure EXTL's "true value," the Expert Witness used the ten days following the publication of a November 14, 1994 *Barron's* article, which discussed the facts underlying EXTL's misstatements and omissions, including the class action complaint's allegation that EXTL had been overstating income. *See* Exh. 25 to the Flynn Affidavit. Using $4.43—EXTL's average stock price during that period—as a baseline, the Expert Witness then adjusted EXTL's price to reflect a decline in the Standard & Poor's Long Distance Telephone Index (the "Telecom Index"), an index which includes such major, well financed companies as AT & T, MCI and Cable & Wireless. From there the Expert Witness used a proprietary computerized model—which reflects adjustments for such factors as inflation, float, volume, intra day trading and short interest—to determine that total Class damages were $18.5 million.

**(ii) *The Expert Witness' Supplemental Damages Report***

On January 28, 1997, the Expert Witness produced a supplemental damages report (the "Supplemental Report"). *See* Def. Exh. 15. In the two page narrative of that Report, the Expert Witness noted that after "continued study and analysis," he had "constructed an alternative measure of damages" using the "constant ribbon" method. This time, the Expert Witness compared the aver-

age price of EXTL's stock for the 10 days following publication of the November 14, 1994 *Barron's* article with the average price of EXTL's stock for the 10 days ending on October 21, 1994. While the Supplemental Report provides no explanation as to why that particular date was used to establish a comparative measuring period, it may be presumed that October 21 was chosen because that was the date that Judge Sweet issued his opinion in the EXTL proxy litigation. *See Krauth et al. v. Executive Telecard, Ltd.*, 1994 WL 584556 (S.D.N.Y. Oct. 21, 1994) (holding that a proposed EXTL proxy statement failed to disclose Bertoli's role in the management of EXTL, and that that failure represented a material omission in violation of Section 14(a) of the Securities and Exchange Act of 1934).

The Expert Witness' comparison of the stock prices during the two periods yielded a difference of $2.48 or 35.5 percent. The Expert Witness then adjusted that number downward to 30.8 percent to "reflect market factors, which included the performance of telecommunications stocks and the market in general." Def. Exh. 15 at 1–2. According to the Expert Witness, 30.8 percent represented the extent to which EXTL stock was inflated during the Class Period. From there the Expert Witness input the 30.8 percent into a "Proportional Decay Model," to arrive at a total damages figure of $14.6 million after deducting $400,000 to account for ineligible purchases.

*(b) Principles for assessing the reliability of the Expert Witness' proposed testimony*

■ In assessing the reliability of the Expert Witness' damages analysis we are mindful of the well-settled general principle that damages in a securities fraud case are measured by the difference between the price at which a stock sold and the price at which the

stock would have sold absent the alleged misrepresentations or omissions. *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 154–55, 92 S.Ct. 1456, 1472–73, 31 L.Ed.2d 741 (1972). We are also guided by the principles associated with the "negative causation" defense under Section 11(e) of the Securities Act of 1933. *See* 15 U.S.C. § 77k(e); *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1048 (2d Cir.1995). Those principles—when applied within the damages valuation context—simply require elimination of that portion of the price decline that is the result of forces unrelated to the wrong. *See McMahan & Co.*, 65 F.3d at 1048; *see also Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1342 (9th Cir.1976). Such forces can be broadly categorized into: (1) company risk—the unique risk that is peculiar to the particular stock at issue, and (2) market risk—the risk associated with market wide variations generally. *See* Brealey & Meyers, *Principles of Corporate Finance*, (5th ed.1996) at 173.

In determining the value of Class damages in this case, the methodologies used by the Expert Witness to evaluate both EXTL's company risk and its market risk appear to be seriously flawed.

*(i) Company risk and the Expert Witness' failure to consider factors other than the alleged fraud*

The reliability of the Expert Witness' proposed testimony is called into question by his failure to indicate either in his Original or Supplemental Report whether he conducted an "event study" to determine whether EXTL's stock price was affected by company specific factors exclusive of the challenged fraud. Although the Expert Witness' deposition testimony is inconsistent on this point, it does suggest that he approached this issue in a rather cursory fashion.[1] For example, the

---

1. *See* Document #146, Exhibit 14, docketed March 24, 1994, Expert Witness Deposition at 227–228 and at 25:

 Q. Turning back to your December 15, 1996 report, in that report, anywhere in those pages, does it reflect any elimination with respect to any portion of the decline that was the result of matters unrelated to the two general allegations of wrongdoing asserted in the complaint?

 A. No.

 Q. Did you do an events study or similar analysis to isolate influences of information specific to [EXTL] other than the allegations made in the complaint when you made the conclusion you reached in your December 15, 1996 [report]?

 A. No. Let me revise that. I had read the press releases. I had not read them side by side with the daily price history as I did subsequently.... Let me say when I was reading the press releases, I noted if there was a response in the markets to these press

Expert Witness conceded that his Original Report did not consider the effect on EXTL's stock price of the proposed spinoff of EXTL divisions to Turks & Caicos. *See id.* at 325–26. This concession is disconcerting—as plaintiffs themselves point out there were significant shareholder concerns "about the wisdom of the proposed [s]pinoff." *See* Plaintiffs' Mem. at 20. While it is entirely conceivable that these concerns played a role in the behavior of EXTL's stock price during the chosen measuring period, neither of the Expert Witness' Reports provide any basis for determining whether that was the case.

The Expert Witness' failure adequately to distinguish between fraud related and non-fraud related company specific influences on EXTL's stock price in this case appears similar to the approach taken by the expert in *In re Oracle Securities Litigation,* 829 F.Supp. 1176, 1181 (N.D.Cal.1993). In *Oracle,* the court expressed grave reservations about the reliability of the expert's methodology for much the same reasons that raise doubt here:

> Use of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to *Oracle* which defendants allegedly have distorted. As a result of his failure to employ such a study, the results reached by [the expert] cannot be evaluated by standard measures of statistical significance. Hence, the reliability of the magnitude and direction of his value estimates are incapable of verification.

*Oracle,* 829 F.Supp. at 1181 (citing Note, *Estimating Aggregate Damages in Class Action Litigation under Rule 10b–5 for Purposes of Settlement,* 59 Fordham L.Rev. 811, 822 (1991)).

Because the Expert Witness' proposed testimony in this case appears to rest on the same flawed analysis that was evident to the court in *Oracle,* this Court cannot conclude that it rests on a "reliable basis in the knowledge and experience of his discipline." *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796. Accordingly, the Court rules that the Expert Witness' proposed testimony as it presently

stands is inadmissable under Fed.R.Evid. 702.

As a final matter on this point, we address plaintiffs' reference to Magistrate Judge Gold's acceptance of the Expert Witness' testimony in *Winkler v. NRD Mining Ltd.,* a case in which the Expert Witness prepared reports on the damages incurred by shareholders of NRD Mining Ltd.—a company engaged in the business of quality quartz mining. *See Report and Recommendation,* 82–CV–3318 (E.D.N.Y. June 29, 1995). This Court is unpersuaded by the *Winkler* Report and Recommendation for several reasons.

First, Magistrate Judge Gold's Report in *Winkler* does not describe the Expert Witness' analysis in great detail, focusing instead on his impressive qualifications. As such it provides little basis for determining whether his analysis in *Winkler* was subject to the same flaws that are so manifest here. *See Report and Recommendation* at 3–4. Second, to the limited extent that Magistrate Judge Gold does describe the Expert Witness' analysis, he depicts an "event study" methodology which standing alone would not have satisfied this Court. Magistrate Judge Gold admitted the Expert Witness' proposed testimony on the basis that he had "tracked the price behavior of an index of mining stocks during the class period, and used that information to remove the effect of general market forces from the price changes in NRD stock." *See Report and Recommendation* at 8. This type of "event study" if performed alone would not have conformed with the fundamental principles of the securities valuation discipline. As noted above, a proper methodology for eliminating that portion of the price decline that is the result of forces unrelated to the wrong, should include elimination for both general market factors and company specific factors. In this case, it is clear that the Expert Witness has failed to undertake a thorough consideration of the factors specific to EXTL in formulating his damages estimates. Accordingly, we reject plaintiffs' assertion that Magistrate Gold's acceptance of the Expert Witness' proposed testimony in *Winkler* should prompt this

releases, and so I didn't characterize that as analysis. Yes, I did do it as I was reading

through the press releases.

Court to accept his proposed testimony in this case.

### (ii) *Market risk and the Expert Witness' reliance on the S & P Telecommunications Index*

The Expert Witness' failure to conduct a thorough "event study" would be reason enough to exclude his proposed testimony. However, his Original Report, and to a lesser extent his Supplemental Report, are also vulnerable to criticism on an independent ground which reinforces the validity of our concerns. In factoring in market risk factors within his analysis of EXTL's stock price behavior, the Expert Witness appears to have relied exclusively on the Telecom Index. He did so by discounting his per share damages figure to reflect a decline in the Telecom Index during the 10–day period following publication of the *Barron's* article.

The Expert Witness initially attempts to explain his exclusive reliance on the Telecom Index by claiming that EXTL "itself invited comparison to that Index," by including within its proxy statement a graphic juxtaposition of the relative performances of the Index and of EXTL stock. *See* Plaintiff's Mem. at 41 and Doc. No. 152, Exhibit # 14, Expert Witness Deposition at 95. This explanation alone raises serious questions about the reliability of the Expert Witness' methodology. Apparently, the Expert Witness suggests that EXTL's choice of a comparative set of criteria which highlighted the favorable performance of its stock, should be interchangeable with the criteria used to measure the "true" damages incurred by EXTL's shareholders.[2]

These two sets of criteria are plainly not interchangeable. Indeed, it is undisputed that EXTL's stock price does not have a

meaningful correlation with the Telecom Index. *See* Doc. No. 146, Exhibit # 14, Expert Witness Deposition at 211–12. Plaintiffs argue that this factor should not be dispositive, since the Telecom Index was chosen as a "conservative" benchmark which "decreases damages, from a base line value of $4.09 per share to $4.43 per share." Indeed, according to plaintiffs, had the Telecom Index not been used, the damages claimed against defendants would have risen "substantially." Plaintiffs' Mem. at 42.

This contention rests on an assumption which is simply unfounded. It is undisputed that EXTL stock is far more volatile than the stocks—such as AT & T and MCI, which compose the Telecom Index. *See* Chart at Exh. 19 to Reply Aff. of Steven Altman. As a result, the Expert Witness' use of the Telecom Index actually could have raised damages over their "true" level. Because of EXTL's greater volatility, its "true" decline—in other words, the amount it would have declined absent any fraud—could actually have been greater than that of the Telecom Index in the 10 days following the *Barron's* article. A more pronounced decline would have driven the base line value up over the $4.43 actually used, and conversely would have driven total damages down.

While EXTL's hypothetical "true" stock price may not have behaved in this manner, the fact that it could have—a fact which cannot be reflected through reference to the Telecom Index alone—seriously undermines the reliability of the proposed testimony. In sum, while it is clear that a security should not be valued in isolation, *see* Brealey & Meyers at 160, the Expert Witness' use of the Telecom Index—rather than a more precisely correlated portfolio of securities [3]—

---

**2.** EXTL's choice in this regard was made pursuant to Item 402(*l*) of Regulation S–K. *See* 17 C.F.R. § 229.402(*l*). Under that regulation, EXTL was required to provide a line graph comparing its cumulative total shareholder return with a performance indicator of the overall stock market and either "a published line-of-business index" or a group of EXTL selected companies "with similar market capitalizations." *Id.* Significantly, EXTL chose to compare its performance to the Telecom Index, as "a published line-of-business index," presumably because that comparison was a favorable one and easier to do. Understandably, EXTL chose not to compare it-

self directly with other companies with "similar market capitalizations."

**3.** In contrast to the highly capitalized companies like AT & T and MCI included in the Telecom Index, a "small-cap" stock like EXTL does not trade on reported earnings per share, but instead moves in accordance with the market's expectations and perceptions of its long term economic prospects. *See* Defendants' Experts' Damages Report at Def. Exh. 16 at 5. n. 2. Euphemistically, EXTL's stock could be said to trade on "hope." How then could plaintiffs factor in general market risk in evaluating class damages?

compounds the serious reliability questions already raised by the failure to conduct an "event study."

### 2. Defendants' Motion for Summary Judgment

■ As noted above, defendants also move for summary judgment, contending that in the absence of the Expert Witness' testimony, plaintiffs would be unable to prove the requisite element of damages. A party is entitled to summary judgment when the pleadings, affidavits and evidence show that there is no genuine issue as to any material facts such that the moving party is entitled to judgment as a matter of law. Lang v. Retirement Living Pub. Co., 949 F.2d 576, 580 (1991). A material fact, is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir.1997). Once the moving party has met its burden to show that there is no genuine issue of material fact, the party opposing the motion has the burden to show specific facts proving that there is a genuine issue remaining for trial. Urena v. Biro Manufacturing Co., 114 F.3d 359, 362 (2d. Cir.1997) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986)).

In this case, although defendants have demonstrated that the Expert Witness' proposed testimony is insufficiently reliable to be admitted at trial to prove the amount of damages, they have not demonstrated that there is no genuine issue of material fact as to the existence of actual damages.

In disputing the existence of damages, defendants rely primarily on their challenge to the Expert Witness' choice of the ten days following the November 14, 1994 Barron's article as a normative period by which to measure damages. According to defendants, the Expert Witness should have used the ten days following October 27, 1994—the date of Judge Sweet's opinion in Krauth—as his normative period, but chose not to do so, "because use of that period would result in a calculation of zero damages." See Def. Reply Mem. at 11.

■ Defendants' assertion does have surface appeal. Under the efficient market hypothesis, endorsed by the plurality in Basic v. Levinson, the price of a security reflects all publicly available information. See 485 U.S. 224, 246, 108 S.Ct. 978, 991, 99 L.Ed.2d 194 (1988). Therefore, in the absence of other influences, the price of a fraudulently inflated security and its "true" value should converge on or shortly after the date the fraud or misrepresentation is disclosed. See Brealey and Meyers at 323–24 ("all relevant and ascertainable information is already reflected in security prices"). As defendants point out, plaintiffs' Amended Complaint states that October 27, 1994 was "the date that Judge Sweet's opinion was widely disseminated, putting investors on notice of defendants' financial fraud and of the Bertoli connection to EXTL." See Def. Exh. 1 at ¶ 39. Thus, according to defendants, the Expert Witness should have used the 10 days immediately following October 27, 1994 as his normative period, since that is the period when the effect of the alleged fraud, if any, should have manifested itself upon the price of EXTL stock. Claiming that EXTL's stock price did not decline during that period, and that therefore Class damages were "zero," defendants demand summary judgment.

As a threshold matter, we note that defendants' reliance on the plaintiffs' Amended Complaint is misplaced. Contrary to what defendants assert (and what the Amended Complaint seems to suggest), the full extent of EXTL's alleged fraud did not become "widely disseminated" until publication of

"A decent estimate is possible if you find traded firms that have roughly the same profitability, risks, and growth opportunities as your firm." Brealey & Meyers at 72. This Court notes that in the current market, there are numerous "small cap" indices which are composed of companies, that much like EXTL, appear to trade on "hope."

These indices would almost certainly have a greater price correlation with EXTL's stock than would the Telecom Index. It seems to us, therefore, that a more reliable damages analysis could have used such an index to factor in the effect of market risk on EXTL's stock price and on Class damages.

the *Barron's* article on November 14, 1994. That article made public for the first time the original class action complaint's assertion that EXTL had been "systematically understating its expenses," an allegation which had not been touched upon by Judge Sweet's opinion in *Krauth. Compare The Insider* article in *Barron's* at 31 with *Krauth*, 1994 WL 584556. Thus, the Expert Witness was correct in determining that "disclosure began with Judge Sweet's Opinion, and the *Barron's* article, which appeared in the November 14, 1994 edition, constituted full dissemination." *See* Original Report at ¶ 8., Accordingly, this Court concludes that the Expert Witness was at least correct in his use of the ten days following publication of the *Barron's* article as the normative period by which to measure damages.

In any case, even assuming that the ten days following October 27, 1994 somehow represents a more appropriate normative period, and even accepting defendants' assertions that in those ten days there was "zero" price decline in EXTL's stock price, that does not mean that there were "zero" Class damages. Once again, as a general principle, damages in a securities fraud case are measured by the difference between the price at which a stock sold and the price at which the stock would have sold absent the alleged fraud. Absent the alleged fraud, the price at which EXTL stock would have sold during the ten days following October 27, 1994 may well have been much higher than it actually was. Indeed, rather than not declining, EXTL's stock price may well have appreciated during that period. The question of whether that hypothetical appreciation could represent real Class damages is in itself enough of a genuine issue of material fact to defeat defendants' summary judgment motion.

Even if it were not, however, this Court should be reluctant to grant defendants' motion. This is a class action brought by fiduciaries to enforce the rights of the absent members. Thus, in considering whether to grant summary judgment, this Court must consider that members of the Class not actually present as parties to this litigation may be bound by the judgment—but only where they are in fact adequately represented by the parties who are present. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812, 105 S.Ct. 2965, 2974, 86 L.Ed.2d 628 (1985) ("[T]he Due Process clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.") (citing *Hansberry v. Lee*, 311 U.S. 32, 41–42, 45, 61 S.Ct. 115, 118–19, 85 L.Ed. 22 (1940) ("It is familiar doctrine of the federal courts that members of the class not present as parties may be bound by the judgment where they are in fact adequately represented by parties who are present.")).

Under the circumstances present here we should not allow this case which appears to have merit on the issue of liability, to go off on what is tantamount to a pleading failure. By failing to proffer expert testimony of sufficient reliability to be admitted at trial, the class representative plaintiffs seem to have fallen short in fulfilling their obligation adequately to represent the interests of the absent members. Accordingly, while the flaws in the Expert Witness' testimony mean that plaintiffs have thus far failed to offer any admissible proof on the issue of damages, summary judgment would be inappropriate at this time, and the motion is denied.

In the interests of allowing plaintiffs to fulfill their obligation adequately to represent the interests of the absentee Class members, this Court grants plaintiffs a reasonable time to enlist the services of a new damages expert, or alternatively to have the Expert Witness revisit the issues in order to correct the flaws described herein.[4]

## B. Plaintiffs' Motions

### 1. *Partial Summary Judgment*

■ We now turn to plaintiffs' motion for partial summary judgment on the materiality

---

4. The Expert Witness apparently recognized the defects in his analysis. Among other things, he testified that: "I did not realize that there was such a small relationship between [EXTL] and [the Telecom Index], that there was really none *that I could find at all.* I thought there might be some." In addition, the Expert Witness acknowledged that he was "extraordinarily busy" in and around the time he was preparing his damages analysis. *See* Doc. No. 146, Exhibit # 14, Expert Witness Deposition at 214, 218.

of EXTL's alleged failure to disclose the Bertoli connection. Relying on the Supreme Court's explanation of the materiality of omissions in *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), plaintiffs claim that there are no genuine issues of fact as to whether the additional disclosures EXTL should have made about the Bertoli connection would have altered "the 'total mix' of information" available to shareholders during the Class Period.

This Court disagrees. In *TSC Industries,* the Supreme Court "warned against deciding on summary judgment the issue of whether an omission or misrepresentation is material. Only if the established omissions are 'so obviously important to an investor that reasonable minds cannot differ on the question of materiality' should the ultimate issue of materiality be resolved by summary judgment." *Langner v. Brown,* 913 F.Supp. 260, 269 (S.D.N.Y.1996) (12b–6 motion) (quoting *TSC Industries,* 426 U.S. at 450, 96 S.Ct. at 2133).

Plaintiffs here have failed to demonstrate that defendants' omission of the Bertoli connection during the Class period would have been of such obvious importance to investors as to justify summary judgment. As defendants point out, the fact that EXTL's management may have conferred with a convicted felon, with a history of securities violations, is not *per se* material.[5] Even a crook may have valuable business judgment to share with the management of a corporation in which his family owned substantial share holdings. Indeed, the market may very well have appreciated Mr. Bertoli's expertise—defendants assert that the market price of EXTL stock held relatively steady in the days following disclosure and dissemination of the Bertoli connection through Judge Sweet's opinion in *Krauth,* an assertion which plaintiffs apparently do not dispute and which we take as true within this inquiry. *See Lendino v. Trans Union Credit Information Co.,* 970 F.2d 1110, 1112 (2d.

Cir.1992) (noting that in the summary judgment context courts must draw all reasonable inferences and resolve all ambiguities in favor of the nonmoving party). While EXTL's purported price stability in the days following disclosure of the Bertoli connection does not mean that management's reliance on Bertoli was immaterial, it does at least indicate that there are sufficient issues of disputed fact on the question as to preclude summary judgment.

### 2. *Issue Preclusion*

As a final matter we address plaintiffs' claim that they are entitled to collateral estoppel, or issue preclusion,[6] on the issue of the materiality of the Bertoli connection, based on Judge Sweet's decision in *Krauth. See* 1995 U.S. Dist. Lexis 15255. To invoke issue preclusion successfully, plaintiffs must show that (1) the issues in both proceedings were identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits. *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 91 (2d Cir.1997). Where a party seeks to use issue preclusion offensively, as plaintiffs do here, this Court has "broad discretion to determine when it should be applied" and should not do so where it would be "unfair" to defendants. *Parklane Hosiery Co. Inc., v. Shore,* 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979).

According to plaintiffs, the identical issue of the materiality of the Bertoli connection was raised, litigated, and adjudicated by Judge Sweet in *Krauth.* Thus, plaintiffs argue that it would be fair to preclude defendants from re-litigating that issue in this case. Again, we disagree.

In *Krauth,* Judge Sweet enjoined EXTL from soliciting proxies without disclosing

---

**5.** *See* Item 401(f)(2), (5) of Regulation S–K which requires registered companies to disclose the securities violations and criminal convictions (excluding traffic violations and other minor offenses) of "any director, person nominated to become a director or executive officer." 17 C.F.R. § 401(f). Similar disclosure is not re-

quired of those who merely confer with officers and directors.

**6.** Although plaintiffs assert the collateral estoppel doctrine, that doctrine now "operates as 'issue preclusion.'" *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 91 (2d Cir.1997).

what he determined to be the material facts surrounding the Bertoli connection. 1994 U.S. Dist. Lexis 15255 at \*24. The issue confronting Judge Sweet in *Krauth* was whether, under Section 14(a) of the Exchange Act, EXTL's 1994 proxy materials adequately disclosed to shareholders who were voting for new board members the extent of Richard Bertoli's involvement with members of EXTL management who were running for re-election. *Id.* at \*18. In resolving that issue, Judge Sweet held that Bertoli's involvement with EXTL's directors was "material in an election context in which [the directors'] loyalty and competency is per force an issue." [7] *Id.*

The issue with respect to the Bertoli connection in this case is different from that encountered in *Krauth* in at least two respects. First, as Judge Sweet notes, the materiality of the Bertoli connection in *Krauth* was considered within the context of the election of a board of directors, where questions of integrity and loyalty necessarily come into play. In this case, the materiality issue stands in an entirely different posture—namely, whether a reasonable investor would find that had EXTL disclosed the Bertoli connection, whatever it was, the 'total mix' of information available to shareholders would have been altered. Second, while in *Krauth* material omissions were alleged with respect to the proposed 1994 proxy statement alone, the alleged omissions in this case cover the entire Class Period, from 1991 to 1994. As such, defendants had no opportunity to litigate the issue of whether the Bertoli connection was material over the entire course of the 1991–1994 Class Period; or whether to the extent that the market had preexisting knowledge of it, disclosure of Bertoli's involvement would not have altered the total mix of knowledge available to investors anyway.

For these reasons, this Court concludes that application of issue preclusion would be unfair to the defendants in this case. *Parklane Hosiery Co.*, 439 U.S. at 331, 99 S.Ct. at 651.

**Conclusion**

For the reasons set forth above, defendants motion to exclude the proposed testimony of plaintiffs' Expert Witness is granted. Plaintiffs are entitled to a reasonable time to enlist the services of a new damages expert or alternatively to have the Expert Witness reform his analysis to correct the flaws described in this opinion. Defendants' motion for summary judgment is denied. Finally, plaintiffs' motion for summary judgment is denied.

SO ORDERED.

---

7. As noted *supra* at note 5, it is not alleged that Mr. Bertoli was a "director, person nominated to become a director or executive officer" of EXTL.

Thus, disclosure of his criminality is not required by Item 401(f) of Regulation S–K. 17 C.F.R. § 401(f).