PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TFWS, INCORPORATED, t/a Beltway
Fine Wine and Spirits,
              *Plaintiff-Appellant,*

              v.

WILLIAM DONALD SCHAEFER, in his
official capacity as Comptroller of
the Treasury of the State of
Maryland; CHARLES W. EHART, in
his official capacity as
Administrator of the Alcohol and
Tobacco Tax Unit of the
Comptroller of the State of
Maryland,
              *Defendants-Appellees.*

No. 02-1199

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-99-2008-S)

Argued: October 30, 2002

Decided: March 31, 2003

Before LUTTIG, MICHAEL, and TRAXLER, Circuit Judges.

Vacated and remanded by published opinion. Judge Michael wrote
the opinion, in which Judge Luttig and Judge Traxler joined.

**COUNSEL**

**ARGUED:** William James Murphy, MURPHY & SHAFFER, Baltimore, Maryland, for Appellant. Steven Marshall Sullivan, Assistant Attorney General, Baltimore, Maryland, for Appellees. **ON BRIEF:** John J. Connolly, MURPHY & SHAFFER, Baltimore, Maryland, for Appellant. J. Joseph Curran, Jr., Attorney General of Maryland, Andrew H. Baida, Solicitor General, Meredyth Smith Andrus, Assistant Attorney General, Baltimore, Maryland, for Appellees.

**OPINION**

MICHAEL, Circuit Judge:

This case is on its second trip to this court. TFWS, Inc., a large liquor retailer in Maryland, is suing the State Comptroller to obtain a declaration that certain Maryland regulations governing the wholesale pricing of liquor and wine violate the Sherman Act. When the case was before us the first time, we affirmed the district court's determination that the regulations violate the Sherman Act, but we remanded for further consideration of the Comptroller's Twenty-first Amendment defense. On remand the district court granted summary judgment to the Comptroller, ultimately concluding that Maryland's interest in promoting temperance, which is protected by the Twenty-first Amendment, outweighs the federal interest in promoting competition under the Sherman Act. However, one of the questions that was to be decided on remand — whether the regulations are effective in promoting temperance — involves disputed factual issues that cannot be resolved on summary judgment. We therefore vacate the award of summary judgment to the Comptroller and remand once again for further proceedings.

I.

The Maryland liquor regulations under challenge by TFWS are explained in some detail in our first opinion, *see TFWS, Inc. v. Schaefer*, 242 F.3d 198, 202-03 (4th Cir. 2001), so we offer only a brief summary here. The first regulation, the post-and-hold pricing system,

prescribes how and when liquor wholesalers may change their prices. *See* Md. Ann. Code art. 2B, § 12-103(c) (Lexis 2001). By the fifth of each month, wholesalers must post a schedule of prices with the Comptroller. Md. Regs. Code tit. 03, § 02.01.05B(2) (2003). These prices are locked in for the following month. *Id.* § .05B(3)(a). The Comptroller makes each wholesaler's monthly posting available to all other wholesalers. *Id.* § .05D. The second regulation is known as the volume discount ban or the antidiscrimination rule. It requires a wholesaler to offer every retailer the same price for a given product. *See* Md. Ann. Code art. 2B, § 12-102(a) (Lexis 2001); Md. Regs. Code tit. 03, § 02.01.05B(3)(c) (2003). Wholesalers cannot cut prices to large retailers because discounts "of any nature" are prohibited. *See* Md. Regs. Code tit. 03, § 02.01.05B(3)(c) (2003).

In our first opinion we affirmed the district court's determination (1) that the post-and-hold regulation is a hybrid restraint that is illegal per se under § 1 of the Sherman Act, (2) that the volume discount ban is a per se violation of § 1, and (3) that Maryland cannot claim "state action" immunity from the Sherman Act because the regulatory scheme is not actively supervised by the state. *See TFWS*, 242 F.3d at 208-11; *see also id.* at 213-15 (Luttig, J., concurring). We held, however, that the district court's dismissal of TFWS's complaint on Twenty-first Amendment grounds was premature. In the first round the district court concluded on its own motion that "despite their anti-competitive effect," the regulations "should be upheld under the [liquor control] powers reserved to the states under the Twenty-first Amendment." *TFWS, Inc. v. Schaefer*, Civ. No. S99-2008, slip op. at 16-17 (D. Md. Sept. 1, 1999). We held that it was too early for the district court to reach that conclusion because "neither side had a chance to make its case on the Twenty-first Amendment issue." *TFWS*, 242 F.3d at 211. As a result, we vacated the order of dismissal and remanded the case with the following instructions:

> On remand Maryland should be given the opportunity to assert and substantiate its Twenty-first Amendment defense, and TFWS should be permitted to respond. The analysis the district court should undertake in analyzing Maryland's interest and then balancing it against the federal interest is straightforward. First, the court should examine the expressed state interest and the closeness of that interest to

those protected by the Twenty-first Amendment. We acknowledge that little analysis is needed on this point. Temperance is the avowed goal of the Maryland regulatory scheme, and the Twenty-first Amendment definitely allows a state to promote temperance. Second, the court should examine whether, and to what extent, the regulatory scheme serves its stated purpose in promoting temperance. Simply put, is the scheme effective? Again, the answer to this question may ultimately rest upon findings and conclusions having a large factual component. Finally, the court should balance the state's interest in temperance (to the extent that interest is actually furthered by the regulatory scheme) against the federal interest in promoting competition under the Sherman Act.

*Id.* at 213 (quotation marks and citation omitted).

On remand the parties conducted discovery, which included the exchange of reports from expert witnesses, who were also deposed. In due course the parties filed cross-motions for summary judgment. The district court granted summary judgment for the Comptroller, (1) finding that the Maryland regulations achieved their stated purpose of promoting temperance and (2) concluding that Maryland's interest in promoting temperance outweighed the federal interest in preserving free competition. TFWS appeals. We conduct a de novo review of the grant of summary judgment. *Bond v. Blum*, 317 F.3d 385, 394 (4th Cir. 2003).

## II.

TFWS's appeal boils down to the argument that the district court relied on disputed evidence to grant summary judgment to the Comptroller on his Twenty-first Amendment defense. We will look at key issues considered on remand to see whether they could be decided on summary judgment.

## A.

The district court's first job in deciding whether the Comptroller had established his Twenty-first Amendment defense was to "exam-

ine the *expressed* state interest [in establishing the regulatory scheme] and the closeness of that interest to those protected by the Twenty-first Amendment." *TFWS*, 242 F.3d at 213 (emphasis added). The Maryland legislature authorized the regulations for the express purpose of "fostering and promoting temperance" and "eliminat[ing] the undue stimulation of the sale of alcoholic beverages." Md. Ann. Code art. 2B §§ 12-102(a), -103(a) (Lexis 2001). *See also id.* at § 1-101(a). The district court therefore concluded that Maryland established its post-and-hold liquor pricing system and its volume discount ban with the "avowed goal of promoting temperance," which "is a proper objective under the Twenty-first Amendment." *TFWS*, 183 F. Supp. 2d at 791. This conclusion cannot be disputed, so we agree.

## B.

### 1.

Our second question for the district court on remand was "whether, and to what extent, the regulatory scheme serves its stated purpose in promoting temperance." *TFWS*, 242 F.3d at 213. This inquiry, we said, should focus on a basic question, "[I]s the scheme effective?" *Id.* Whether the regulatory scheme actually serves its stated purpose is essentially a question of fact. In the summary judgment proceedings on remand, each side presented its case on this question largely through experts, who offered two types of evidence, theoretical and empirical. The theoretical evidence applies general principles of economics to Maryland's regulatory scheme. Each side's theoretical evidence predicts the consumption results that it claims should follow from Maryland's scheme. The empirical evidence includes actual data about alcohol prices and consumption in Maryland and other states or localities.

The Comptroller's evidence showed the various ways that the regulations could, according to economic principles, promote temperance. The Comptroller's first expert was Dr. Frank J. Chaloupka, a professor of economics at the University of Illinois. Dr. Chaloupka offered the opinion, based on his review of published studies, that (in general) alcohol consumption falls as prices rise. This, he said, is in line with "one of the fundamental laws of economics — that of the downward sloping demand curve, which states that as the price of a product

rises, the quantity demanded of that product falls." The Comptroller's second expert was Dr. David T. Levy, a professor of economics at the University of Baltimore. Dr. Levy suggested ways in which the Maryland scheme could, as a theoretical matter, reduce price competition and lead to higher liquor prices. Dr. Levy talked first about the volume discount ban. The discount ban prevents a wholesaler from offering its customers (liquor retailers) price discounts. If wholesale price discounts were legal, the lower prices would likely be passed on to consumers with a resulting increase in demand. Further, because wholesalers cannot provide discounts as a reward to retailers who increase sales of a given product, the retailers have less incentive to offer price promotions or sales on that product. Dr. Levy also explained why the post-and-hold regulation should have an anticompetitive effect. This regulation, he said, reduces price competition because a wholesaler's prices are locked in and may not be reduced for thirty days after they are posted with the Comptroller. Furthermore, even when prices are reduced in a new filing, the cuts will be less effective because of the regulation. The price posting requirement means that a price cutter's action is immediately known to his competitors. According to Dr. Levy, when there is no price posting and a seller reduces prices, he should gain sales until his competitors gradually learn of his reductions and match them. Under Maryland's price posting scheme, this period of advantage is limited to a single month, making price cuts less worthwhile and thus less likely.

Dr. Levy also presented some empirical evidence suggesting that alcohol prices in Maryland are "generally higher" than in other states. His figures were drawn from data gathered by the American Chamber of Commerce Research Association (ACCRA). Every quarter ACCRA samples prices of consumer goods, including beer, wine, and spirits, in cities around the country. Dr. Levy calculated the average price of these beverages for each state for the years 1996 through 1999. After adjusting the averages for cost-of-living differences in the various locales, he concluded that Maryland's 1999 average wine price exceeded the average in other states by more than a dollar. Maryland prices for spirits, according to Dr. Levy, were about five percent lower than the average in other states. He attributed this result to higher taxes or (sometimes) to state monopolies in the other jurisdictions. Dr. Levy's report singles out Delaware, a Maryland neighbor with higher taxes on liquor, for comparison. He concluded that Dela-

ware's prices for spirits are about fifteen percent lower than Maryland's after adjustment for differences in the cost-of-living. He noted that wine and beer prices are also lower in Delaware, but declined to put a figure on the difference.

TFWS offered a single expert, Dr. Thomas R. Overstreet, Jr., who is an economist. Dr. Overstreet advanced both theoretical evidence and empirical data. On the theoretical side, he offered several reasons why the Maryland regulations might fail to reduce liquor consumption despite increased prices. First, consumers might respond to higher prices by buying less expensive brands or types of alcoholic beverages. Spending the same amount of money, they could consume just as much as they did before the price increase. On the other hand, they might allocate more money to alcohol purchases. Second, increased prices will expand wholesalers' profit margins, leaving them extra money to invest in marketing, which might increase consumption or at least counteract the effect of higher prices. Third, by reducing competition between large and small liquor retailers, the regulations may increase the number of small retailers across the state, and this could increase consumption.

Although Dr. Overstreet, like the Comptroller's experts, did not gather any data of his own, he used available data to run a series of empirical comparisons. First, he compared Maryland's per capita consumption of wine, spirits, and beer with that of the other forty-nine states. He found that while Maryland was in the top half of all states in the consumption of wine and spirits between 1980 and 1997, its consumption of beer has been falling relative to other states. Maryland beer prices are not regulated by the challenged scheme. Dr. Overstreet suggested that if the one beverage not subject to the regulations is also the one beverage with declining consumption, the regulations may not be effective in reducing consumption. Second, Dr. Overstreet compared the changes in Maryland's per capita consumption of the three categories of alcoholic beverages with the trends for the United States as a whole. He found a very tight correlation between Maryland and the country for wine and spirits consumption. With respect to these two beverages, Maryland's consumption patterns and trends were very similar to the country as a whole. In the 1970-97 period evaluated by Dr. Overstreet, Maryland beer consumption was considerably below the national average. Indeed, beer con-

sumption in Maryland fell faster and further than the national average. According to Dr. Overstreet, this suggests "that the absence of [post-and-hold] regulations do[es] not prevent other factors [such as culture or demographics] from tempering consumption." Finally, Dr. Overstreet examined alcohol consumption patterns in California and Nebraska, two states where post-and-hold regulations had been struck down by courts. (California's regulations were invalidated by *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980), and Nebraska's by *Finocchiaro v. Liquor Control Commission*, 351 N.W.2d 701 (Neb. 1984).) Specifically, Dr. Overstreet looked at whether consumption rates changed after the regulations were invalidated. In California consumption did not change very much for the seven years immediately after the regulations ended, but then it tailed off sharply. In Nebraska consumption did not change significantly in the period after invalidation.

In addition to Dr. Overstreet's expert evidence, TFWS offered the deposition testimony of David J. Trone, the president of TFWS. Trone or members of his family own companies that run liquor stores in the Mid-Atlantic region. Trone, based on what he said was first-hand information, testified that liquor and wine prices are lower in Maryland than in Delaware, New Jersey, Pennsylvania, and Virginia.

TFWS also attacked the weight of Dr. Levy's evidence. Dr. Levy's figures, TFWS argued, are based on inappropriate data and do not support his conclusions. The ACCRA quarterly price samples upon which he depends consist of the price of a single brand and size of wine, a single brand and size of liquor, and six-packs of two brands of beer, each taken from a single liquor store in each of two to four Maryland cities, depending on the year. The sampled stores were not randomly selected within the cities, nor is there any showing that alcohol prices in these cities are representative of prices across the state. The Comptroller responded by noting that ACCRA data are widely used and are the most accurate available for tracking alcohol prices.

In addition to questioning the quality of the underlying data used by Dr. Levy, TFWS argued that his calculations do not lead to meaningful results. Because the cities sampled by ACCRA are of widely varying populations, taking a straight average of their prices does not

properly reflect the price paid by the average Marylander; Dr. Levy should have weighted the prices to reflect population differences, TFWS claimed. TFWS further questioned whether the cost-of-living adjustment was properly applied or even appropriate. And perhaps most important, TFWS suggested a flaw in the logic that leads from Dr. Levy's averages to the conclusion that Maryland's scheme is actually effective. Dr. Levy compares Maryland prices to the rest of the country and to Delaware and finds Maryland's to be generally higher. Maryland's regulatory scheme is just one way in which Maryland is different from other states. Any number of other variables — for example, culture, economics, or demographics — could explain why Maryland's prices are generally higher than the average in the rest of the country. Dr. Levy's analysis does not come to grips with the effect of other variables on consumption in Maryland and elsewhere.

In deciding whether Maryland's scheme is effective, the district court discussed only the theoretical evidence offered by the three experts. In the end, the court credited Maryland's experts. *TFWS, Inc. v. Schaefer*, 183 F. Supp. 2d 789, 793 (D. Md. 2002). The court rejected the theories advanced by TFWS's expert, Dr. Overstreet, saying that his deposition testimony and report "lack[ed] the persuasiveness of the evidence offered by the [Comptroller], in the form of the expert testimony of Drs. Chaloupka and Levy." *Id.* The district court rebutted each of Dr. Overstreet's attacks on the Comptroller's basic argument that higher alcohol prices lead to lower demand. First, the district court rejected Dr. Overstreet's contention that because the regulations have the effect of protecting small retailers, the scheme increases the number of retail liquor outlets. The court said that the state could control the number of retailers through its licensing system. *Id.* Second, the court rejected Dr. Overstreet's contention that higher prices might trigger switches to cheaper brands by repeating the Comptroller's theory that a drinker faced with higher prices "might prefer to [stick to his brand but] drink less." *Id.* at 793-94. Finally, the court dealt with Dr. Overstreet's point that Maryland's scheme allows for wide profit margins for wholesalers, who can devote some of that money to marketing efforts and thereby maintain or increase consumption levels. "While this is a possibility," the court said, "it is a remote, speculative, and tolerable one, in light of the direct effect the scheme has on keeping prices high." *Id.* at 794. The

court did not address either side's empirical evidence about alcohol prices or consumption trends. In crediting the reports and deposition testimony of the Comptroller's experts, Dr. Chaloupka and Dr. Levy, the district court determined that their opinions supported the conclusion that Maryland's scheme leads to higher alcohol prices and is effective in reducing alcohol use. The district court ultimately found that the Comptroller had "adequately substantiated [Maryland's] avowed [temperance objective] of preventing undue stimulation of alcohol sales and consumption through regulation of price competition." *Id.*

2.

We first consider TFWS's evidentiary objection, which the district court rejected. TFWS argues that Dr. Levy's empirical evidence on state-by-state liquor price comparisons is so unreliable as to be inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See also Kumho Tire, Inc. v. Carmichael*, 526 U.S. 137 (1999) (extending *Daubert* to technical experts). We give "great deference" to a district court's decision to admit or exclude expert testimony under *Daubert*. *United States v. Barnette*, 211 F.3d 803, 816 (4th Cir. 2000); *Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 265 (4th Cir. 1998). In applying *Daubert*, a court evaluates the methodology or reasoning that the proffered scientific or technical expert uses to reach his conclusion; the court does not evaluate the conclusion itself. *See Freeman v. Case Corp.*, 118 F.3d 1011, 1016 n.6 (4th Cir. 1997). Dr. Levy's basic methodology was to use ACCRA pricing data for metropolitan areas (not states), calculate average prices, and apply cost-of-living adjustments. TFWS does not mount a true *Daubert* challenge, for it does not argue that these methods have not been tested, have not withstood peer review and publication, have excessive rates of error, have no standards for their application, or have not been accepted in their field. *See Daubert*, 509 U.S. at 593-95. Rather, TFWS basically argues that Dr. Levy's calculations do not support his conclusion that Maryland has higher alcohol beverage prices than most other states. This is a challenge to the proper weight to be given to Dr. Levy's evidence, not to its admissibility. The district court did not abuse its discretion in ruling that Dr. Levy's evidence was admissible.

3.

TFWS's essential argument is that the Comptroller did not present undisputed evidence that Maryland's post-and-hold and volume discount ban regulations actually result in higher liquor prices and lower consumption, making summary judgment for the Comptroller inappropriate. The district court credited the evidence advanced by the Comptroller's experts, rejected the conflicting evidence offered by TFWS's expert, and found that Maryland's regulatory scheme promotes temperance. The district court justified its factfinding, which was based solely on the summary judgment record, as follows:

> [B]oth parties have submitted cross-motions for summary judgment . . . . Neither party has asserted that the factual issue now in dispute (whether Maryland's statutory scheme promotes temperance) presents an issue that must be decided by a jury, by a bench trial, or otherwise by a *viva voce* proceeding. There is ample evidence accompanying both parties' motions in this case, including the depositions and reports of both parties' experts. Because both parties had a full and complete opportunity to cross-examine each other's witnesses at deposition and to challenge their assertions in arguments supported by evidence, this Court finds itself in the position to make a factual determination without resort to further development of the evidentiary record.

*TFWS*, 183 F. Supp. 2d at 791. On appeal TFWS argues that if it was not entitled to summary judgment, the district court was required to conduct an evidentiary hearing as a prerequisite to any factfinding. We agree that the district court had no warrant in this case to take the summary judgment record and engage in factfinding.

A party is entitled to summary judgment only if it can "show that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. That standard does not change when, as in this case, both parties move for summary judgment. "The fact that both parties simultaneously are arguing that there is no genuine issue of fact does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." *Podberesky v. Kirwan*, 38 F.3d 147, 156 (4th Cir. 1994)

(brackets omitted) (quoting 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 (2nd ed. 1983)). In other words, "[a] district court may not resolve conflicts in the evidence on summary judgment motions." *Id.* at 157. Because much of the evidence in this case is expert opinion and statistics, we can appreciate why the district court believed that it was more efficient to go ahead and resolve the evidentiary conflicts in the summary judgment record. But that procedure was inappropriate here because the parties did not consent to it or waive their right to a trial if there turned out to be disputed issues of material fact. *See Satellite Television & Associated Res., Inc. v. Cont'l Cable of Va.*, 714 F.2d 351, 354 (4th Cir. 1983); *see also Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 643-45 (1st Cir. 2000).

The district court arrived at its conclusion that the Maryland regulations were effective in promoting temperance by weighing conflicting evidence. To obtain summary judgment, the Comptroller had to show by uncontested facts that alcohol consumption in Maryland is lower, or growing more slowly, than it would be without the regulations. To make this case, the Comptroller took Dr. Levy's empirical evidence and combined it with Dr. Chaloupka's application of general economic theory: Dr. Levy maintains that Maryland's alcohol prices are generally higher, and Dr. Chaloupka claims that higher prices lead to lower consumption. To get from these propositions to the conclusion that the Comptroller has carried his burden, the court had to first find that Dr. Levy's figures are reliable. Next, it had to find that the higher prices Dr. Levy shows are due at least in part to the regulations. The court then had to infer that higher prices have led to falling consumption.

TFWS challenges the district court's findings and conclusions in several ways. First, TFWS argues that Dr. Levy's figures are not sufficiently representative or comprehensive to prove that alcohol prices in Maryland are higher than in the rest of the country. In addition, TFWS says that Dr. Levy's figures are contradicted by David Trone, who testified that prices are lower in Maryland than in surrounding states. Second, TFWS points to Dr. Overstreet's theoretical evidence suggesting that even if Maryland's regulations do result in higher prices, reduced consumption does not necessarily follow. According to him, higher prices do not necessarily bring lower consumption

because consumers might switch to cheaper brands or opt to pay the high prices. Moreover, reduced competition results in more retail stores. Third, TFWS attacks the final, crucial inference that the regulations reduce Maryland's consumption. Even if Dr. Levy is right that Maryland's prices are generally higher than the rest of the country's, that does not show that the regulations are the reason. And Dr. Overstreet's empirical evidence suggests that Marylanders actually consume wine and spirits in about the same quantities as the rest of the United States, further calling into question whether the regulations affect consumption. Finally, Dr. Overstreet's evidence shows that the elimination of post-and-hold rules in California and Nebraska had little effect on consumption. Contrary to the Comptroller's argument, *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993), does not prevent TFWS from using Dr. Overstreet's theoretical evidence to challenge the Comptroller's factual assertions. *Brooke Group* specifically allows TFWS to use Dr. Overstreet's expert opinion — that high liquor prices do not necessarily reduce demand in this regulatory regime — "as a guide to interpreting [the Comptroller's] market facts." *Id.*

Here, the Comptroller, in order to obtain summary judgment, had to show that there is no genuine issue of material fact about the effectiveness of the regulations. He failed to make this showing. To find that the Comptroller carried his burden, the district court had to choose the Comptroller's version of the evidence over TFWS's version. It had to find that TFWS's challenges leave Dr. Levy's evidence of high prices intact and reliable. It had to find that high prices lead to reduced consumption in Maryland, notwithstanding Dr. Overstreet's contentions to the contrary. It had to find either that Dr. Overstreet's figures about relatively high consumption in Maryland are wrong or that Maryland's consumption would be even higher without the regulations. In making each of these findings, the district court had to decide which party's evidence on economic theory was more persuasive and which party's data were entitled to greater weight. These are not decisions that can be made on summary judgment. We see no alternative to a trial on the question of whether, and to what extent, Maryland's regulatory scheme is effective in promoting temperance.

## C.

Because the district court could not decide on summary judgment whether and to what extent Maryland's regulations serve their stated purpose in promoting temperance, it could not perform its last task. Specifically, it was not in a position to "balance the state's interest in temperance (to the extent that interest is actually furthered by the regulatory scheme) against the federal interest in promoting competition under the Sherman Act." *TFWS*, 242 F.3d at 213. That balancing, of course, will determine whether the regulations may stand, even if they are anticompetitive.

We vacate the order granting summary judgment to the Comptroller and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*