**Joe MILLER, IV; Robert W. Pearce, Jr., Plaintiffs–Appellants,**

v.

**ASENSIO & COMPANY, INCORPORATED, Defendant–Appellee,**

and

**Manuel P. Asensio; Asensio Capital Management Incorporated; John Does 1–20, Defendants.**

**Joe Miller, IV; Robert W. Pearce, Jr., Plaintiffs–Appellees,**

v.

**Asensio & Company, Incorporated, Defendant–Appellant,**

and

**Manuel P. Asensio; Asensio Capital Management Incorporated; John Does 1–20, Defendants.**

Nos. 03–1225, 03–1262.

United States Court of Appeals, Fourth Circuit.

Argued: Jan. 21, 2004.

Decided: April 14, 2004.

**ARGUED:** Keith R. Dutill, Stradley, Ronon, Stevens & Young, Malvern, Pennsylvania, for Appellants/Cross-appellees. Keating Lewis Simons, III, Law Offices Of Simons & Keaveny, Charleston, South Carolina, for Appellee/Cross-appellant. **ON BRIEF:** Michael D. O'Mara, Stradley, Ronon, Stevens & Young, Malvern, Pennsylvania, for Appellants/Cross-appellees.

Before MOTZ, GREGORY, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Judge GREGORY and Judge DUNCAN joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

This appeal raises a question of first impression—does a finding of liability under Rule 10b–5 in a private securities case require an award of damages. We hold that it does not and reject the other appellate challenges put forward by the parties. Accordingly, we affirm the judgment of the district court entered on the basis of a jury verdict finding liability, but awarding no damages.

### I.

This case grows out of derogatory statements made by employees of Asensio & Company, Inc. ("Asensio") about Chromatics Color Sciences International, Inc. ("CCSI"). Stockholders of CCSI brought this suit, alleging that these statements constitute material misstatements, which Asensio initiated to defraud the market for its benefit, and which caused their CCSI stock to decline in value, resulting in substantial monetary losses to them.

Asensio, an investment bank licensed to broker securities, focuses on identifying "short sale" opportunities, i.e., transactions through which investors sell a stock and then hope to buy it back at a lower price. In addition to making its own investments, Asensio researches companies, makes an assessment as to their viability, and issues recommendations to investors based on its view of a company's prospects. Asensio maintains that it specializes in identifying companies in which fraud or hype have assertedly inflated the stock's prospects or price.

In the months leading up to June 1998, Asensio amassed a significant short sell interest in CCSI, which had developed the Colormate III, a medical device to measure the bilirubin level of babies in a non-invasive manner. In 1997, the Food and Drug Administration had granted CCSI permission to commercially market the Colormate III and the Patent & Trademark Office had issued CCSI a patent. By May 1998, CCSI was in the "final stages of contract negotiation" with three major medical device companies to produce, market, and distribute the Colormate III.

However, from June 8 to June 26, 1998, Asensio posted on its website and attempted to disseminate as widely as possible seven reports recommending that investors sell or take a short position in CCSI. Asensio suggested that CCSI's stock price was inflated, on two related grounds. First, the Colormate III allegedly had little potential to become a widely used medical device. Second, according to Asensio, questionable private stock sales and other financial maneuverings had artificially inflated CCSI's stock price.

From June 9 to June 24, 1998, CCSI issued five press releases attempting to rebut the Asensio reports. Even so, after Asensio released its reports, medical device companies ceased contract negotiations with CCSI and the price of CCSI stock dropped. On the last trading day prior to the issuance of Asensio's first report on June 8, 1998, the closing price for CCSI stock was 10.75; CCSI stock did not again reach that closing price until February 8, 1999, eight months later. Ultimately, CCSI stock rose again to a closing high of 13.75 in May 1999 and CCSI succeeded in signing a distribution agreement with a medical device company in June 1999. However, by November 2001, CCSI's stock had been de-listed and, at the time of trial, was trading over-the-counter at a price approaching zero.

Beginning in 1996, Plaintiffs Robert Pearce and Joseph Miller purchased significant amounts of CCSI stock on margin,

i.e., they borrowed money from their brokers to purchase the stock. As the price of CCSI stock declined, Plaintiffs' brokers issued margin calls requiring that Plaintiffs either provide additional equity or sell portions of their CCSI holdings. Pearce intermittently sold CCSI stock in varying amounts and at various prices from June 11, 1998 to October 1999. Miller similarly sold CCSI stock in varying amounts and at various prices between June 8, 1998 and late June 1998.

Plaintiffs filed this action on June 10, 1999, under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (2000), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (2003), promulgated pursuant to that statute. They allege that Asensio's reports contained false and misleading information, and that this information resulted in a decline in the price of CCSI stock and caused them damage when they had to sell CCSI stock at an artificially low price. Plaintiffs specifically identified six statements made by Asensio in two of its reports as false or misleading. These statements minimized the importance and practicality of CCSI's Colormate III as a method of testing for bilirubin and assert that the market for Colormate III was "extremely limited."

At trial, Plaintiffs' expert, Dr. Perry Woodside, testified first as to causation, stating his opinion that Asensio's misrepresentations caused the decline in the price of CCSI stock. Dr. Woodside then testified to the measure of Plaintiffs' out-of-pocket damages, which he calculated as the "true value" of CCSI stock (defined as "the value of the stock in the absence of the action and the reports by Asensio") less the amount Plaintiffs received for the stock on each date on which they sold it from June 8, 1998 to June 10, 1999.[1] Dr. Woodside set the true value of CCSI stock by choosing as a starting price the average price of CCSI stock the week or month prior to June 8. He then charted how CCSI stock would have behaved between June 8, 1998 and June 10, 1999 absent Asensio's misrepresentations, by use of a "benchmark" mutual fund that he believed reacted to market conditions in the same way that CCSI would have but for the misrepresentations. Significantly, in calculating Plaintiffs' damages, Dr. Woodside determined that no factor—other than Asensio's misrepresentations—negatively impacted the price of CCSI stock on the dates that Plaintiffs sold the stock.

Asensio challenged Dr. Woodside's testimony on a number of grounds. In particular, Asensio contended that a host of factors, including truthful information contained in its reports, CCSI's public rebuttals of the reports, and scandals involving major CCSI shareholders, impacted CCSI's stock price during the relevant period. Although Asensio did not offer expert testimony as to why CCSI stock declined at specific points, Manuel Asensio, the company founder, testified as to the occurrence of certain significant events on those dates. The company further relied on its reports (which contained a good deal of negative information about CCSI apart from the six misstatements identified by Plaintiffs), CCSI's rebuttal press releases, and various news articles relating negative information about CCSI. Asensio also cross-examined Dr. Woodside and Plaintiffs about events or information other than the identified misrepresentations that assertedly impacted CCSI's stock price.

---

**1.** Neither party has raised the potential application of 15 U.S.C. § 78u–4(e)(2000), which caps damages to a security's mean trading price over a 90–day period when a plaintiff seeks to establish damages by reference to the security's market price.

At the close of evidence, the district court properly instructed the jury both as to liability and damages. The court then provided the jurors with a special interrogatory that posed two questions. First, after stating the four elements necessary to establish liability under Rule 10b–5, it asked if the jury unanimously found that Plaintiffs had established these elements by a preponderance of the evidence. If the jurors answered "no," they were instructed to go no further. If, however, they answered "yes," they were directed to turn to a second inquiry and set forth the total amount Plaintiffs were "actually damaged as a result of the Defendant's alleged fraud."

During deliberations, the jury sent a written question to the trial judge asking "Is this a mandate to award a value greater than zero dollars given a yes response to question one?" After consulting with counsel, and over Plaintiffs' objection,[2] the district court responded: "The answer to that question is: No. The calculation of damages is outlined in the charge on page 23. You can award whatever amount of damages you find each plaintiff has proved, from zero dollars up to the amount requested by each plaintiff."

The jury then returned a verdict finding Asensio liable, but awarding "$0.00" in damages. The district court entered judgment on that verdict, awarding the Plaintiffs zero damages. The court denied the parties' post-trial motions except to modify its judgment so as to award costs to neither party.

## II.

The parties appeal and cross appeal on numerous grounds, the most central of which is whether, as a matter of law, the finding of liability in this private securities action requires the award of damages in some amount.

■ Section 10(b) of the Securities Exchange Act of 1934 protects "investors against manipulation of stock prices." *Basic Inc. v. Levinson*, 485 U.S. 224, 230, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Thus, courts have long recognized a private cause of action for violation of this provision. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196–97, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In order to establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove: "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir. 1994) (and numerous cases cited therein).

In this case, a jury acting pursuant to a proper charge (neither Plaintiffs nor Asensio contend to the contrary) found that Plaintiffs had proved each of these elements, including the last, i.e., that Asensio's false statements had "proximately caused the plaintiff[s'] damages." *Id.* Yet that same jury awarded Plaintiffs no damages, even though it had also been properly instructed as to the measure of damages—the difference between the "fair value of what" Plaintiffs "received" and the "fair value of what they would have received had there been no fraudulent conduct" at the time of sale. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741

---

**2.** Asensio contends that Plaintiffs failed to preserve any objection to the court's answer to this question. The argument is meritless. The district court and counsel engaged in a wide-ranging discussion of the issue, during which they discussed a number of options, but Plaintiffs' counsel clearly and repeatedly stated his objection to an answer which informed the jury that it could "award zero damages."

(1972). (We recognize that other damage theories may be appropriate in some situations, *id.*, but Plaintiffs here sought only out-of-pocket damages).

Plaintiffs argue that this result does not conform with the law; that jurors could not find that Asensio's misrepresentations proximately caused Plaintiffs' "damages," *Hillson,* 42 F.3d at 208, and nonetheless award Plaintiffs *no* damages. According to Plaintiffs, once the jury found Asensio liable, i.e., that it proximately caused their damages, the jury had to award Plaintiffs some amount of damages. Brief of Appellant at 40–41. Thus, Plaintiffs maintain that the district court erred when, in response to the jury's question, it informed the jury that a finding of liability did not constitute "a mandate to award a value greater than zero dollars" in damages.

Not surprisingly, Asensio contends that the district court properly answered the jury's question. The company does not maintain that Plaintiffs failed to offer evidence of scienter or reliance.[3] Moreover, Asensio explicitly concedes that Plaintiffs presented evidence that its statements "caused a decline in the market price" of CCSI stock, and that "there was evidence before the jury to sustain its findings of both transaction causation and loss causation." Brief of Appellee at 45. But the company maintains, without further expla-

nation,[t]hat the jury found Asensio to have contributed to a decline in the market price for CCSI shares does not mean the Plaintiffs necessarily were injured in consequence of that decline." *Id.* at 46.

Neither party offers much support for its position, and we have found surprisingly little law on this question. The treatises note the "relative paucity of decisions" dealing with damages in Rule 10b–5 cases. 2 Thomas Lee Hazen, *The Law of Securities Regulation,* § 12.12, at 528 (4th ed.2002); 3 Alan R. Bloomberg & Lewis D. Lowenfels, *Bloomberg & Lowenfels on Securities Fraud & Commodities Fraud,* § 9.1, at 9.10.14 n. 6 (2d ed.2003). They attribute the scarcity of case law to the fact that "most 10–5 litigation does not proceed to final judgment on the merits." 2 Hazen, *supra.* Instead, those plaintiffs successful in establishing "the elements of a private cause of action" have generally "settled without the need to precisely define the measure of recovery." 3 Bloomberg, *supra.*

The case at hand, however, does require that we grapple with this question. We now turn to that task.

### III.

In denying Plaintiffs' post-trial motion for a new trial on damages, the district court, of course, considered this question.

---

**3.** Initially and briefly, Asensio does argue that none of its statements about CCSI are actionable under Rule 10b–5 because they assertedly involve "matters of opinion," not factual assertions. We disagree. The statements cannot be dismissed as unverifiable opinion; they set forth or were grounded in "actual past or present facts," which Plaintiffs demonstrated to be false. *See Malone v. Microdyne Corp.,* 26 F.3d 471, 479 (4th Cir.1994) (emphases omitted); *Cooke v. Manufactured Homes, Inc.,* 998 F.2d 1256, 1259–63 (4th Cir.1993) (holding statements as to company's finances potentially actionable). *See generally Virginia Bankshares, Inc. v. Sandberg,* 501

U.S. 1083, 1091–95, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (holding opinion may be actionable when based on demonstrably false assumptions). Nor do we find persuasive Asensio's argument, that its admittedly erroneous and widely publicized statement about the scope of CCSI's clinical testing, is not actionable because accurate information about the study was available in a scientific journal; rather, the jury well could have found that this statement significantly altered the "total mix" of information available to reasonable investors. *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

The court believed that the jury's findings of liability, but no damages, could be "harmonized." *See Atlas Food Sys. & Servs. Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 599 (4th Cir.1996) (upholding district court's explanation for seemingly inconsistent verdict). In its attempt to so harmonize, the district court relied on a semantic distinction between the proximately caused "injury" necessary to prove liability and the "damages" necessary to recover a monetary award. The case law, however, forecloses such a distinction. We, along with other courts, use the terms "injury" and "damages," as well as "loss" and "harm," interchangeably to refer to the actual pecuniary loss that a private plaintiff must establish to prove liability in a Rule 10b–5 case. *See, e.g., Rombach v. Chang*, 355 F.3d 164, 169 n. 4 (2d Cir.2004) ("injury"); *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 342 (4th Cir. 2003) ("damages"); *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 888 (8th Cir.2002) ("economic harm"); *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir.1991) ("losses").[4]

Although we disagree with the district court's post-trial rationale for upholding the jury's verdict, we agree with the premise underlying its answer to the jury's question: namely, that a jury faithfully following a legally sound charge can find liability and no damages. We recognize that this conclusion initially appears at odds with the general proposition that the law imposes no liability without proof of damages. Nevertheless, we believe a close review of the limited helpful case law supports the conclusion that we reach in this case.

First, these cases indicate that although courts use "damages" (as well as "injury," "harm," or "loss") in discussing liability in 10b–5 cases, they employ that term to resolve a different question than the *amount* of recoverable damages, which is the standard damages inquiry. Second, these cases demonstrate that when courts require a showing of damages *proximately caused* by the defendant's conduct for liability, they require only that the plaintiff show that the defendant's conduct was a *substantial* cause of its injury; it is during the subsequent damages inquiry that the exact amount of damages *solely* caused by the defendant's conduct must be calculated.

A.

■ Turning to the first point, when determining whether a plaintiff has demonstrated that a defendant proximately caused damages to establish Rule 10b–5

---

**4.** The district court also briefly suggested that the jury could have awarded Plaintiffs zero damages because it concluded that "even if Asensio's fraud forced plaintiffs to sell at a lower price than true value, it actually prevented further losses by causing them to sell before the CCSI shares declined still further in value." We must reject this suggestion as well, because the correct measure of out-of-pocket damages, as the district court properly instructed the jury, is the difference between what Plaintiffs "received for the shares and the fair market value of the shares *at the time of the sale*." *Wortley v. Camplin*, 333 F.3d 284, 296 (1st Cir.2003) (emphasis added); *see also Affiliated Ute Citizens*, 406 U.S. at 155, 92 S.Ct. 1456. This does not mean, however, as Plaintiffs suggest, that the district court abused its discretion in admitting evidence of the present day, near-zero value of CCSI stock. As the district court noted, this was "probative evidence that Mr. Asensio's statements were accurate." Nor, as Plaintiffs also argue, did the court abuse its discretion in refusing to admit a Letter of Acceptance, Waiver and Consent issued by the National Association of Securities Dealers to Mr. Asensio. The court acted within its discretion in determining that the letter's potential for prejudice outweighed any limited probative value, particularly given that the letter did not directly contradict Mr. Asensio's submissions or testimony.

*liability,* courts look to whether the plaintiff has proved the *fact* that the defendant caused damages, rather than the *amount* of recoverable damages. *See, e.g., Law v. Medco Research, Inc.,* 113 F.3d 781, 786–87 (7th Cir.1997) (dismissing 10b–5 claim when plaintiffs failed to rebut testimony that general market forces caused the entire decline in value because if "the fraud caused *no* harm, the suit fails") (emphasis added); *Harnett v. Billman,* 800 F.2d 1308, 1315 (4th Cir.1986) (upholding dismissal of plaintiff's 10b–5 claim where plaintiff "neither alleged, nor could he prove, *any* injury arising out of fraud") (emphasis added); *Wolf v. Frank,* 477 F.2d 467, 478–79 (5th Cir.1973)(finding that plaintiffs could not establish actual damage sufficient to sustain a 10b–5 claim when they ultimately profited from the transaction in question).

Indeed, courts considering 10b–5 claims often refer to the *fact* of proximately caused damage and the *amount* of proximately caused damage as involving separate, although related, inquiries. *See, e.g., Rochez Bros., Inc. v. Rhoades,* 527 F.2d 891, 894–95 (3d Cir.1975) (finding that "injury ha[d] plainly been shown and liability ha[d] been conclusively established" even though plaintiff had "failed to place into evidence all the necessary elements for an accurate determination of damages"); *In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 744–45 (S.D.N.Y.1985), *aff'd,* 798 F.2d 35 (2d Cir.1986) (noting "expert testimony would be needed to fix not only the amount, but the existence of actual damages"); *see also* Private Litigation Securities Reform Act ("PLSRA"), Pub.L. No. 104–67, § 21D, 109 Stat. 737, 747 (1995) (codified at 15 U.S.C. § 78u–4(b)(4)) (suggesting a distinction between "the loss" and the amount for which damages can be recovered by stating that in a Rule 10b–5 action, the plaintiff must prove the defendant's actions caused "*the loss* for

which the plaintiff seeks *to recover damages*") (emphasis added). Thus, courts not infrequently bifurcate the liability and damages phases of 10b–5 trials. *See, e.g., Gross v. Weingarten,* 217 F.3d 208, 215 (4th Cir.2000).

For purposes of liability in a Rule 10b–5 case, a plaintiff's proof of damages proximately caused by the defendant seems to function as a gate-keeping requirement designed to forestall attenuated, and difficult to prove, claims. *See generally Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 734, 747–48, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (holding that standing to bring a private damage action under Rule 10b–5 is limited to "the class of plaintiffs . . . who have at least dealt in the security" in "an objectively demonstrable" way and does not include those who sue "for intangible economic injury such as loss of a noncontractual opportunity to buy or sell" to protect against an "inexorable broadening of the class of plaintiff who may sue in this area of the law"). Requiring plaintiffs to demonstrate the fact of proximately caused damage to establish 10b–5 liability precludes wholly speculative claims and claims by plaintiffs who ultimately profit from, or experience no economic pinch as a result of, the challenged transaction. *E.g., Wolf,* 477 F.2d at 478–79.

But this requirement does not seem intended to deter plaintiffs who suffer a harm, but have difficulty proving the precise amount of their recoverable damages. Imposing a requirement that plaintiffs prove the amount of recoverable damages to establish liability would potentially frustrate a significant number of claims by such plaintiffs because proof of the amount of recoverable damages in a 10b–5 case may be difficult to establish. *See generally Blue Chip Stamps,* 421 U.S. at 734, 95 S.Ct. 1917 (noting that "the damages suffered by purchasers and sellers pursuing a

§ 10(b) cause of action may on occasion be difficult to ascertain"); *In re Warner Communications*, 618 F.Supp. at 744 (referring to the calculation of recoverable damages as a " 'battle of the experts,' " the result of which "is virtually impossible to predict with any certainty").

This analysis of the proximately caused loss necessary to prove liability neither invites unwarranted and attenuated claims, nor discourages sufficiently concrete claims. Rather, our conclusions mirror the balance regarding cognizable claims set forth in *Blue Chip Stamps*, as well as the Supreme Court's general directive that "§ 10(b) must be read flexibly, not technically and restrictively and that the statute provides *a cause of action* for any plaintiff who suffer(s) *an injury* as a result of deceptive practices touching its sale [or purchase] of securities." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 475–76, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (emphasis added) (internal quotation marks and citation omitted).

Thus, we believe Rule 10b–5 is best read to permit, in an appropriate case, a jury to find liability but award no damages. However, such cases will be rare. Most often, if a plaintiff can demonstrate that the defendant's acts caused him economic loss and so establish liability, the plaintiff will also be able to establish "facts and circumstances tending to show the probable amount of ... damages" sufficient to allow the trier of fact to form a "reasonable and probable estimate" of recoverable damages. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 565, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (quotation marks omitted). If a plaintiff proves

liability and "damages which are definitively attributable to the wrong," a jury's award of damages will be upheld even if there is some "uncertain[ty]" as to "their amount." *Id.; see also Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 906 F.2d 1206, 1217–19 (8th Cir.1990).[5]

However, the amount of recoverable "damages may not be determined by mere speculation or guess." *Story*, 282 U.S. at 563, 51 S.Ct. 248. A plaintiff must still produce "evidence show[ing] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate," and if the plaintiff fails to do so a fact finder cannot award damages. *Id.; see also United States Life Ins. Co. v. Mech. & Farmers Bank*, 685 F.2d 887, 895–97 (4th Cir.1982) (affirming district court's finding of breach of an indenture agreement but refusal to award damages for that breach); *Glick v. Campagna*, 613 F.2d 31, 37–38 (3d Cir.1979) (upholding finding of liability, but vacating damage award and remanding in 10b–5 case because district court did not have "an adequate foundation for determining the stock's value"); *Rochez Brothers*, 527 F.2d at 894–95 (remanding for further determination of the amount of recoverable damages although 10b–5 plaintiff's injury and liability had been "plainly shown" because "[a]lthough the law does not command mathematical preciseness from the evidence in finding damages, sufficient facts must be introduced so that a court can arrive at an intelligent estimate without speculation or conjecture").

**B.**

■ Turning to the second point, we note that although recovering an award of

---

5. The principle enunciated in *Story*—that a plaintiff's inability to prove damages with mathematical precision does not bar recovery—both allows presentation of somewhat "uncertain" damage calculations to the jury and insulates from vacatur the jury's "esti-

mate" based on such calculations. The Supreme Court, however, has never suggested that this principle can be turned on its head to *require* vacatur of a jury's award of zero damages.

damages requires a 10b–5 plaintiff to prove that defendant's fraud *actually caused* the damages awarded, 15 U.S.C. § 78bb(a) (2000), establishing loss sufficient to prove liability ("loss causation") does not require a plaintiff to prove that the defendant's fraud was the *sole* cause of the plaintiff's loss. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 186–87 (3d Cir.2000) (holding that plaintiff adequately pled loss causation by alleging that defendant's misrepresentations "directly or proximately caused, or were a *substantial contributing cause of*, the damages sustained by plaintiff" and observing that "[s]o long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery") (emphasis added); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir.1997)(noting that 10b–5 plaintiff satisfactorily pleads loss causation without alleging "that all of its loss can be attributed to the false statement of the defendant") (emphasis added).

In sum, to establish 10b–5 liability, a plaintiff need only prove that defendant's misrepresentation was a *substantial* cause of the loss by showing "[a] direct or proximate relationship between the loss and the misrepresentation." *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 360 (4th Cir. 1996).[6] On the other hand, recovering out-of-pocket damages based on the market price of a security (as Plaintiffs have sought) "require[s] elimination of that portion of the price decline that is the result of forces unrelated to the wrong," *In re Executive Telecard, Ltd. Sec. Litig.*, 979 F.Supp. 1021, 1025 (S.D.N.Y.1997); *see also* 2 Hazen, *supra*, at § 12.12[3], at 539, so as to limit recovery to "actual damages on account of the act complained of." 15 U.S.C. § 78bb(a).

■ Thus, in a given case, a jury could properly conclude that (1) the plaintiff proved the defendant's fraud constituted a *substantial* cause of plaintiff's loss and so find the defendant liable but (2) the plaintiff failed to provide a method to discern by "just and reasonable inference," *Story*, 282 U.S. at 563, 51 S.Ct. 248, the amount of plaintiff's loss *solely* caused by defendant's fraud, and so refuse to award the plaintiff any damages. The Eleventh Circuit has come to the same conclusion, albeit in dicta. *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir.1997). The *Robbins* court noted the "important" dis-

---

**6.** In the similar RICO context, courts have frequently discussed the scope of "proximate cause." In civil RICO claims, as here, plaintiffs must demonstrate proximate causation to establish liability, *see Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 265–70, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Brandenburg v. Seidel*, 859 F.2d 1179, 1189 (4th Cir. 1988), *overruled on other grounds by, Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 711, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996), and the measure of damages is *"the harm caused by"* the illegal activity, which must be proven by "competent proof, not based upon mere speculation and surmise." *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 451 (9th Cir.1991) (internal quotation marks and citation omitted); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (noting that a plaintiff has standing only where he "has been injured in his business or property by the conduct constituting the violation" and describing the requisite conduct). RICO cases make clear that a proximate cause "is not ... the same thing as a sole cause." *Cox v. Adm'r United States Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1399 (11th Cir.1994), but rather, "a factor is a proximate cause if it is *'a substantial factor*' in the sequence of responsible causation.'" *Id.* (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–24 (2d Cir.1990) (emphasis added)); *see also In re Am. Honda Motor Co., Inc. Dealerships Relations Litig.*, 941 F.Supp. 528, 543 (D.Md. 1996) (noting that the "proximate cause" necessary to establish RICO liability "need not be the sole cause").

tinction between "loss causation" on the one hand and "proof of damages" on the other. *Id.* at 1447 n. 5. "To satisfy the loss causation element, a plaintiff need not show that a misrepresentation was the sole reason for the investment's decline in value," but "a plaintiff will be allowed to *recover* only damages actually caused by the misrepresentation." *Id.* (emphasis added). Therefore, the court explained "as long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement. But *in determining recoverable damages,* these contributing forces must be isolated and removed." *Id.* (emphasis added).[7]

With these principles in mind, we consider the facts of this case.

## IV.

■ After close review of the record, we believe the evidence at trial provided the jurors with a sound basis on which to reach the result they did. Namely, the jurors could have reasonably found that Plaintiffs offered sufficient evidence that Asensio's misrepresentations constituted one *substantial* cause of Plaintiffs' loss from the decline in value of CCSI stock and so found Asensio liable to Plaintiffs. But, the jurors could also have reasonably found that Plaintiffs failed to offer evidence from which the jurors could discern the *amount* of recoverable damages to Plaintiffs resulting *solely* from Asensio's misrepresentations.

Plaintiffs' expert, Dr. Woodside, a professor of economics and finance, testified that in his expert opinion the Asensio reports caused CCSI's stock price to "decline[ ] tremendously" in the relevant time period—that "in a matter of just very few days, almost 50 percent of the value of the company disappeared." Dr. Woodside explained that he based this opinion on the timing of Asensio's statements (immediately before the precipitous decline) and their extremely negative and untrue assessment of CCSI's sole product, Colormate III. Dr. Woodside further explained that he had examined other market factors that might have borne "upon the decline in the value of stock at the point in time" and found none. The district court did not abuse its discretion in admitting Dr. Woodside's testimony, *see TFWS, Inc. v. Schaefer,* 325 F.3d 234, 240 (4th Cir.2003), and, as Asensio itself concedes, this evidence certainly provided a basis for the jury's liability

---

7. We note that, in antitrust cases, courts have similarly held that in some circumstances a plaintiff may succeed in proving the proximately caused loss necessary to demonstrate liability, yet fail to prove actual recoverable damages. *See United States Football League v. Nat'l Football League,* 842 F.2d 1335, 1376–1379 (2d Cir.1988) (affirming instruction that jurors could find antitrust liability but award "no damages or only one dollar in damages if they found that they could not separate out the amount of losses caused by [defendant's illegal conduct] from the amount caused by other factors"). For this reason, courts have not hesitated to vacate even substantial antitrust damage awards. *See Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1349–52 (9th Cir.1986) (af-

firming jury finding of liability when plaintiff proved "some" injury resulted from antitrust violation but vacating award of $2,770,000 because plaintiff failed "to make any segregation between damages attributable to unlawful competition and that attributable to the unlawful scheme" and remanding for a new trial on damages); *MCI Communications Corp. v. AT & T Co.,* 708 F.2d 1081, 1161–66 (7th Cir.1983) (affirming jury finding of antitrust liability but vacating award of $1.8 million because plaintiff "improperly attribute[d] all losses to defendant's illegal acts, despite the presence of significant other factors" and jury could not "make a reasonable and principled estimate of the amount of damage"); *see also Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 22 (5th Cir.1974).

finding.[8]

However, Plaintiffs did not merely contend that Asensio's misrepresentations were a *substantial* cause of their damages; rather, they contended that Asensio's misrepresentations were the *sole* cause of the decline in CCSI stock prices and their resulting monetary loss. But the evidence they offered in support of this contention was weak. First, although Dr. Woodside so opined, his "event analysis," the sole method by which he (and Plaintiffs) sought to demonstrate the impact of company-specific factors other than the alleged fraud on the price of the stock, was markedly thin. An event analysis is often required to support an expert's damages calculation and generally involves the computation of a statistical regression analysis or, at minimum, the compilation of a detailed analysis of each particular event that might have influenced the stock price. *See In re Imperial Credit Indus., Inc. Sec. Litig.,* 252 F.Supp.2d 1005, 1014–16 (C.D.Cal.2003); *In re Oracle Sec. Litig.,* 829 F.Supp. 1176, 1181 (N.D.Cal.1993). Whatever computations Dr. Woodside made, however, were apparently done in his head; Dr. Woodside never committed any portion of his event analysis, other than his ultimate conclusion, to written form.

Asensio also challenged other assumptions essential to Dr. Woodside's opinion that Asensio's fraud caused all of Plaintiffs' damages, including Dr. Woodside's choice of a benchmark stock. Dr. Woodside testified that Royce Microcap provided an appropriate benchmark for projecting the performance of CCSI stock absent the fraud, but the jury then heard testimony that Dr. Woodside had, in his first two reports, failed to make any adjustment for market factors and, indeed, only added a market adjustment using Royce Microcap in a supplemental report that he created over the weekend immediately proceeding his in-court testimony.

Furthermore, Asensio offered evidence of many other factors that could have contributed to the decrease in CCSI's stock price during the relevant period. Asensio suggested that CCSI's stock price had been artificially inflated for various reasons, and was in the midst of a general decline, reflecting the correction of the inflation. Asensio also pointed to information contained in its reports, unrelated to the misrepresentations identified by Plaintiffs, that could have depressed the price of CCSI stock. For example, the reports detailed what Asensio deemed to be a series of dubious financial transactions underlying CCSI's stock offerings and stock price, including an unfolding scandal involving a major CCSI shareholder, and further stated that CCSI had falsely reported receipt of certain approvals from the American Medical Association relating to use of the Colormate III. Moreover, Asensio offered evidence that, during the period that Plaintiffs sold their CCSI stock, the media reported on an unfolding scandal involving major CCSI shareholders, which formed the basis for a suit by CCSI shareholders. On cross-examination, Dr. Woodside even admitted that,

**8.** With regard to the event analysis that Dr. Woodside conducted, the substance (if not the thoroughness) of his analysis and his selection of Royce Microcap, a fund focused on small cap stocks similar to CCSI, as a benchmark were within the bounds of generally accepted methodology. *See In re Executive Telecard, Ltd. Sec. Litig.,* 979 F.Supp. at 1027–28 (emphasizing that if the subject stock is a small cap stock, then the benchmark selected should focus on stocks of a similar nature). Indeed, Asensio offers nothing, beyond its own conclusory contentions, to suggest that Dr. Woodside's determination of CCSI's pre-fraud market price falls outside the bounds of acceptable methods.

although in his view "insignificant," the scandal could have had "some" negative impact on the price of CCSI stock.[9]

" 'We must . . . attempt to reconcile the jury's findings, by exegesis if necessary, . . . before we are free to disregard the jury's verdict and remand the case for a new trial.' " *MCI Telecomms. Corp. v. Wanzer*, 897 F.2d 703, 708 (4th Cir.1990) (citations omitted). Here, we find it entirely possible that the evidence could lead a jury, despite its conclusion that the Asensio reports constituted a *substantial* cause of Plaintiffs' economic loss, to find that it could not calculate the amount of recoverable damages resulting *solely* from the Asensio reports. Because the proof necessary to show the *fact* of proximately caused loss for liability purposes differs—albeit narrowly—from that necessary to prove the *amount* of recoverable damages, we uphold the jury's verdict. Accordingly, the district court did not err in answering the jury's question.[10]

In the vast majority of cases, a finding of the fact of proximately caused loss will result in the award of some amount of damages. However, it would seem contrary to Congress' mandate that a plaintiff prove that the defendant "caused the loss," 15 U.S.C. § 78u–4(b)(4), and that no plaintiff "shall recover . . . a total amount in excess of his actual damages on account of the act complained of," 15 U.S.C. § 78bb(a), to direct a jury that it *must* award damages, even if faced, as here, with a record from which it cannot do so.

V.

For all of the foregoing reasons, the judgment of the district court is in all respects

*AFFIRMED.*

---

**9.** Given all of the above facts, we cannot conclude, as Plaintiffs suggest, that "the record is devoid of any evidence supporting the jury's calculation of Plaintiffs' damages." Brief of Appellant at 19.

**10.** Because we read the district court's decision not to award costs under Fed.R.Civ.P. 54(d)(1) as based on its determination that the case "was a close and difficult one" with small recovery that amounted to victory "in name only" (regardless of whether Asensio was the "prevailing party"), we find that the court did not abuse its discretion by declining to award costs in this case. *Teague v. Bakker*, 35 F.3d 978, 996 (4th Cir.1994).