955 So.2d 1124 (2007)
MORGAN STANLEY & CO. INCORPORATED, Appellant,
v.
COLEMAN (PARENT) HOLDINGS INC., Appellee.
No. 4D05-2606.
District Court of Appeal of Florida, Fourth District.
March 21, 2007.
Rehearing Denied June 4, 2007.
*1125 Bruce S. Rogow of Bruce S. Rogow, P.A., Fort Lauderdale, and Sylvia H. Walbolt of Carlton Fields, P.A., West Palm Beach, for appellant.
Joel D. Eaton of Podhurst Orseck, P.A., Miami, Jerold S. Solovy, Ronald L. Marmer and Paul M. Smith of Jenner & Block LLP, Chicago, IL, and Jack Scarola of Searcy Denney Scarola Barnhart & Shipley, P.A., West Palm Beach, for appellee.
TAYLOR, J.
This appeal arises from a merger between The Coleman Company, Inc., a manufacturer of camping gear, and Sunbeam, Inc., a manufacturer of household products. Coleman (Parent) Holdings Inc. (CPH), which owned most of the Coleman stock before the merger, exchanged its stock for shares of Sunbeam stock. Later, as reports emerged that Sunbeam's sales were falling and that the company had artificially inflated the value of its stock, Sunbeam's stock price plunged. Sunbeam ultimately declared bankruptcy. CPH sued Morgan Stanley & Co., Inc. (Morgan Stanley), Sunbeam's investment banker in the transaction, alleging that Morgan Stanley helped Sunbeam in carrying out its fraudulent scheme to inflate the price of *1126 its stock until after the merger. A jury returned a verdict against Morgan Stanley for conspiracy and aiding and abetting fraud. It awarded CPH compensatory damages of $604,334,000 and punitive damages of $850 million. Morgan Stanley appeals the $1.58 billion judgment entered on the jury verdict. We reverse.
Morgan Stanley raises several issues on appeal, including: (1) whether the trial court improperly entered a partial default against Morgan Stanley as a sanction for discovery misconduct; (2) whether the trial court properly applied Florida law rather than New York law on the issues of justifiable reliance and damages; (3) whether CPH failed to prove compensatory damages by not establishing the fraud-free value of the Sunbeam stock on the date of the merger transaction; (4) whether the trial court erred in denying Morgan Stanley a fair opportunity to contest and mitigate evidence of litigation misconduct presented during the punitive damages phase of trial; and, (5) whether the punitive damages awarded were excessive. Because our decision on the third issue regarding proof of damages is dispositive, we do not reach the other issues and confine our discussion to compensatory and punitive damages.
A. Compensatory Damages
Pursuant to the merger agreement, Sunbeam bought the Coleman stock and paid CPH approximately half of the purchase price with its own stock. CPH received 14.1 million shares of Sunbeam stock, with an estimated value over $600 million. The transaction closed on March 30, 1998.
The merger agreement contained a "lockup" restriction, which limited CPH's ability to sell its Sunbeam stock for a specified period. CPH could not sell more than 25% of the Sunbeam stock for 90 days, then could sell another 25% in another 90 days and the remaining 50% in 270 days. A "lockup" provision is customary in situations where, as here, a company is selling a substantial number of shares and wants them sold in an orderly fashion. The shares were unregistered, but Sunbeam had agreed to register them promptly.
On April 3, 1998, Sunbeam issued a press release announcing that first quarter sales would be 5% below 1997 sales and that the company would show a loss for the quarter. Sunbeam stock dropped 10%, to $34 a share, after this report.
In mid-June 1998, Sunbeam's CEO, Al Dunlap, was fired after an internal investigation revealed fraudulent bookkeeping. Jerry Levin, formerly Coleman's CEO, then took the reins as Sunbeam's CEO and brought several senior Coleman executives with him. By then, the stock price had dropped to $18. Shortly after Dunlap's firing, Arthur Andersen "pulled" its 1996 and 1997 audit certificates.
By the end of 1998, Levin and his team had been at Sunbeam for almost six months. The company had restated its financials for 1996 and 1997, reducing the loss in 1996 and moving it to 1997. Sunbeam still showed a profit for 1997, even after the restatement, and still had assets of $3.5 billion.
Originally, CPH had planned to sell the Sunbeam shares after the "lockup" period. However, several circumstances prevented it from doing so. First, because of the fraud and Arthur Andersen's restatement of Sunbeam's financials, registration of the Sunbeam shares could not be completed until late 1999. Registration of a security is required before it can be sold in the public markets. Second, according to CPH, if, at any time after June 1998, the market had learned that CPH was attempting to sell its Sunbeam stock, "the *1127 market would clearly have viewed that as CPH abandoning a sinking ship and would have destroyed any value for the CPH stock." Third, because senior executives previously affiliated with CPH had assumed positions on Sunbeam's board and gained access to information concerning Sunbeam's performance, CPH was concerned that selling any of its Sunbeam shares could subject it to liability for insider trading.
On February 6, 2001, nearly three years after the transaction closed, Sunbeam went bankrupt. Howard Gittis, the vice-chairman of CPH, testified that, in his opinion, Sunbeam went bankrupt because it was overleveraged, i.e., had too much debt. As a result of the bankruptcy, CPH's Sunbeam shares became worthless.
At trial, CPH sought benefit-of-the-bargain damages. To establish these, CPH presented the testimony of its expert, Dr. Blaine Nye, a financial economist. Dr. Nye testified that CPH suffered damages between $634 and $680 million. He used an expected value for the 14.1 million Sunbeam shares of $48.26 per share (based on the average share price from the time the deal was publicly disclosed until the day it closed), for a total expected value of more than $680 million. Dr. Nye stated his opinion that, because CPH never was able to realize any value from the shares, CPH effectively received "zero" value. As an alternative, he assumed that three-quarters of the shares were saleable in the first quarter of 2000, which would have yielded a share price of $4.35 per share (averaged over the quarter). By that method, CPH's loss amounted to $634 million.
Morgan Stanley objected to the admission of Dr. Nye's opinion on damages. It argued that Dr. Nye's testimony was incompetent, because he did not factor a valuation date into his analysis. Contrary to the requirements set by settled law on fraud damages, his opinion was not based upon the value of the stock on the March 30, 1998 date of the transaction. The court overruled the objection. During cross-examination of Dr. Nye, Morgan Stanley established that Dr. Nye did not calculate the actual value of Sunbeam shares at any point in time. Departing from his practice in other securities cases, he did not determine the "fraud-free" price of Sunbeam stock on the date of closing. He simply assumed CPH could not have recovered any value, as he was instructed to do by CPH. He did not consider whether other factors affected the stock price, such as business decisions by the new management team or the stock market crash of 2000. He did not analyze whether Sunbeam's acquisition of other small companies during this time created problems. He did not look at Sunbeam's expenses while it was being operated by the new management.
After Dr. Nye's examination, Morgan Stanley moved to strike Dr. Nye's testimony and renewed its earlier motions in limine and motion to exclude. Morgan Stanley argued that Dr. Nye's testimony was legally deficient, pointing out that the expert admitted at trial, as well as in deposition, that he "did not use the date of the deal at all" in his analysis and made no attempt to estimate the value of the loss as of March 30, 1998. The court denied the motions. It also denied Morgan Stanley's motion to direct a verdict in its favor due to CPH's failure to prove damages.
On May 16, 2005, the jury returned a verdict finding, by clear and convincing evidence, that CPH relied on the false statements made by Morgan Stanley or Sunbeam, and that it suffered damages as a result. The jury awarded CPH compensatory damages in the amount of $604,334,000. Two days later, after brief testimony regarding punitive damages, the *1128 jury returned a verdict for punitive damages in the amount of $850 million. Morgan Stanley appealed the entire judgment on these verdicts.
CPH sought benefit-of-the-bargain damages from Morgan Stanley. Under the "flexibility theory" of damages followed in Florida, a defrauded party is entitled to the measure of damages that will fully compensate him. Nordyne, Inc. v. Fla. Mobile Home Supply, Inc., 625 So.2d 1283, 1286 (Fla. 1st DCA 1993) ("The `flexibility theory' permits the court to use either the `out-of-pocket' or the `benefit-of-the-bargain' rule, depending upon which is more likely fully to compensate the injured party."). At CPH's request, the trial court concluded that CPH was entitled to benefit-of-the-bargain damages. Damages under the benefit-of-the-bargain rule are measured by the difference between the value of the property as represented and the actual value of the property on the date of the transaction. Kind v. Gittman, 889 So.2d 87, 90 (Fla. 4th DCA 2004); Totale, Inc. v. Smith, 877 So.2d 813, 815 (Fla. 4th DCA 2004); Teca, Inc. v. WM-TAB, Inc., 726 So.2d 828, 829 (Fla. 4th DCA 1999); Perlman v. Ferman Corp., 611 So.2d 1340, 1341 (Fla. 4th DCA 1993). Actual value of the property at the time of purchase is a "crucial element in the damage equation." Teca, 726 So.2d at 829. This is so whether a plaintiff seeks benefit-of-the-bargain damages or an out-of-pocket measure of damages. Kind, 889 So.2d at 90; Totale, 877 So.2d at 815. The same standard is applied in federal securities cases. See Miller v. Asensio & Co., 364 F.3d 223, 227 (4th Cir.2004) (citing Affiliated Ute Citizens v. U.S., 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)) (stating that the measure of damages in 10(b) case was the difference between the fair value of what plaintiff received and the fair value of what they would have received had there been no fraudulent conduct at the time of sale); In re Imperial Credit Indus., Inc. Sec. Litig., 252 F.Supp.2d 1005, 1014 (C.D.Cal.2003).[1]
As a general rule, plaintiffs alleging securities fraud rely on expert proof to establish both the fact of damage and the appropriate method of calculation. Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 301 (3d Cir.1991). CPH's expert testified as to the bargained-for value of the Sunbeam stock, but he did not testify as to the actual value of the Sunbeam stock at the time of purchase  a necessary element of proof. He testified that although he had done such calculations in other cases, in this case he did not isolate the fraud-free price and perform the standard securities analysis to determine what would have been the stock's value on the date of transaction. Instead, he treated the stock as though it had no value when the transaction occurred in 1998.
CPH defends the evidence it presented at trial on damages. It argues that Morgan Stanley is liable for the full amount of its loss, because Morgan Stanley defrauded CPH into accepting shares that it could not resell. It contends that "in cases where misconduct induces a plaintiff to purchase stock and then hinders the plaintiff from reselling that stock, courts repeatedly have held that the wrongdoer is liable for losses until resale can occur." CPH maintains that, because it could not sell its stock, it was not bound by the date-of-transaction rule, but could recover for stock price declines until such time as it *1129 could resell the stock. Consistent with CPH's theory of damages, the trial court instructed the jury to value the stock on the date CPH could first resell it after December 1999, when the shares could be registered.
Morgan Stanley counters that CPH should not be allowed to recover for declines in Sunbeam's stock price during the period that CPH had agreed to a contractual "lockup". By agreeing to the "lockup", CPH bargained for at least part of the stock's illiquidity and accepted the risk of declines in stock price due to market conditions or other non-fraud related factors during the "lockup period". Thus, to allow CPH to recover for non-fraud related losses during the "lockup" period, when CPH had effectively agreed to absorb non-fraud related losses for that period, would amount to giving CPH more than what it bargained for. The record shows that Sunbeam lost approximately 90% of its value during the contractual "lockup" time-frame.
CPH maintains that it is entitled to recover for even non-fraud related stock price declines during this period, because it would not have entered the agreement, with its "lockup" clause, but for the fraud. However, CPH's "but for" causation argument disregards the proximate causation required for fraud damages and is at odds with the benefit-of-the-bargain recovery it elected. Benefit-of-the-bargain damages do not turn on what would have happened if CPH had known the representations were false. They measure what CPH would have received had the representations been true. By opting for benefit-of-the-bargain damages, CPH does not seek to rescind the transaction; it seeks to affirm the transaction and claim the benefit of the bargain. The bargain, in this case, included sale restrictions.
A plaintiff who seeks a benefit-of-the-bargain measure of damages is not entitled to a better bargain than the one it made. This is true even under Florida's "flexibility theory" of damages. The "flexibility theory" of damages, which allows a plaintiff to chose either benefit-of-the-bargain or outof-pocket damages in fraud cases, is not so flexible as to allow a plaintiff to pick and choose which parts of the contract it wants to affirm and which parts it wants to disaffirm. Furthermore, applying CPH's "but for" rationale to proving damages would result in recovery of all non-fraud related losses in virtually every fraud case, because the defrauded party would need only assert that it would not have agreed to the contract had it known of the fraud.
To support its argument that it was entitled to all "pre-sale" losses, CPH relies primarily on Shearson Loeb Rhoades, Inc. v. Medlin, 468 So.2d 272, 273 (Fla. 4th DCA 1985). However, Shearson hinders rather than helps CPH's claim. In that case, we held that the measure of damages for delay in delivery of stock certificates is the difference between the value when the certificates should have been delivered and the value when they were actually delivered. We barred damages for subsequent depreciation absent proof that the plaintiff "would have sold" earlier had the stock been properly delivered. Here, CPH introduced no such proof. To the contrary, it had actually agreed not to sell during the most critical period when Sunbeam lost 90% of its value.
As to the date-of-transaction rule, CPH argues that the transaction date is not necessarily the operative valuation date in a case involving stock or other property that, due to fraud, could not be resold when the fraud was exposed. It contends that once it placed in evidence a stock price table showing the daily market *1130 price of Sunbeam shares from March 1998 until Sunbeam declared bankruptcy in February 2001, the jury could simply select a date when the effects of the fraud no longer existed and perform its own calculation in making an award. However, even if the jury had chosen a date, such as the date Arthur Andersen restated the Sunbeam financials, other factors existed that could have affected the stock price. As the Supreme Court explained in Dura Pharmaceuticals., Inc. v. Broudo, 544 U.S. 336, 342-43, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005):
When a purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.
Thus, recovering in a securities case "require[s] elimination of that portion of the price decline that is the result of forces unrelated to the wrong." Miller, 364 F.3d at 232 (quoting In re Executive Telecard, Ltd. Sec. Litig., 979 F.Supp. 1021, 1025 (S.D.N.Y.1997)).
Usually, a securities plaintiff proves the actual, or "fraud-free," value of the stock at the time of purchase by presenting an expert "event study" or "event analysis." In fact, an "event analysis" is often required to support an expert's damages calculation and "generally involves the computation of a statistical regression analysis or, at a minimum, the compilation of a detailed analysis of each particular event that might have influenced the stock price." Miller, 364 F.3d at 234. This is the kind of calculation that CPH's expert said he had done in other cases.
In Miller, the expert claimed to have done the "event analysis" in his head, never committing any portion of it to paper, other than his final conclusion. The court characterized this analysis as "markedly thin" and upheld a zero verdict, stating that the record was one from which the jury "cannot" have awarded damages. Id. at 235.
In In re Imperial Credit Industries, Inc. Securities Litigation, 252 F.Supp.2d 1005 (C.D.Cal.2003), at the summary judgment stage, the court excluded the defense expert's damages report as junk science under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), then entered summary judgment for the defendant, because the report contained no "event study" or similar analysis. In so doing, it noted:
11. Because of the need "to distinguish between the fraud-related and non-fraud related influences of the stock's price behavior," In re Oracle Sec. Litig., 829 F.Supp. 1176, 1181 (N.D.Cal.1993), a number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar. See, e.g., In re Northern Telecom Sec. Litig., 116 F.Supp.2d 446, 460 (S.D.N.Y.2000) ("Torkelson's testimony is fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information and he did not challenge the event study performed by defendants' expert."); Executive Telecard, 979 F.Supp. at 1024-26 (finding an expert's methodology not reliable because he failed to conduct an event study or regression analysis to detect whether stock price declines were the result of forces other than the alleged fraud; applying Daubert v. Merrell *1131 Dow Pharm., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) to exclude the expert damages report); Oracle, 829 F.Supp. at 1181 ("Use of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to Oracle which defendant allegedly have distorted. . . . As a result of his failure to employ such a study, the results reached by [plaintiffs' expert] cannote evaluated by standard measures of statistical significance.")
12. The importance and centrality of the event study methodology in determining damages in securities cases-and the propriety of rejecting expert damages reports which do not use such a methodology-has been conceded by plaintiffs in other securities fraud cases:
"[A]ccording to [plaintiffs], the methodology-`event study methodology'-used to calculate shareholder damages during the class period `has been used by financial economists since 1969 as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation.' It is so accepted, plaintiffs add, that courts now reject expert damage estimates which do not use event study methodology to evaluate the impact on the market of a company's disclosures."

In re Cendant Corp. Sec. Litig., 109 F.Supp.2d 235, 253-54 (D.N.J.2000).
Imperial Credit, 252 F.Supp.2d at 1015.
CPH was not entitled to have the jury speculate as to the value of the stock on the date of sale. Rather, it was required to prove the stock's value on that date. As we explained in Totale, "the crucial time for the measurement is the time of the fraudulent representation. Later appreciation or depreciation of the property that is subject of the false representation generally does not alter the fraud damage computation." 877 So.2d at 815. The federal cases cited above merely expand on Florida law that requires the plaintiff to prove the actual, "fraud-free" value of the stock at the time of purchase. Although CPH insisted in oral argument that the stock market was doing well and that there were no non-fraud related factors affecting the stock price during the "lockup" period, it failed to present any competent proof at trial establishing the absence of non-fraud related factors.
In sum, CPH failed to meet its burden of proving the actual, "fraud-free" value of the Sunbeam stock on the date of the transaction. Instead, it measured damages based on the stock's value years after the transaction. Because there was no proof presented at trial on the correct measure of damages, the trial court should have granted Morgan Stanley's motion for directed verdict. We therefore reverse the final judgment for compensatory damages and remand for entry of a judgment for Morgan Stanley. See Kind, 889 So.2d at 90; Teca, 726 So.2d at 830.
We reject CPH's argument that it should, at the least, be given a new trial to prove damages because the trial court erred in its pretrial rulings and jury instructions concerning the proper measure of damages. CPH cannot complain about rulings that it urged the court to make in accordance with its damages theory. Furthermore, as we held in Teca, a plaintiff is not entitled to a second "bite at the apple" when there has been no proof at trial concerning the correct measure of damages. Id. at 830.
B. Punitive Damages
The trial was bifurcated, with the jury deciding liability and compensatory damages in Phase I. In Phase II, the jury tried the issue of punitive damages and awarded CPH $850 million in punitive damages. *1132 Because we conclude that Morgan Stanley was entitled to a directed verdict and reversal of the compensatory damages award, we reverse the punitive damages award as well. The punitive damages award cannot stand where, as here, no legally cognizable damage was shown as a result of the alleged fraud. Had the trial court properly directed a verdict for Morgan Stanley, the case would have ended at that point and the punitive damages phase never would have been reached.
CPH argues that we should nevertheless uphold the award of punitive damages. It suggests that even after entering a directed verdict on compensatory damages, the trial court could have submitted the liability issue to the jury as a possible predicate for punitive damages. Relying on Ault v. Lohr, 538 So.2d 454 (Fla.1989), and Engle v. Liggett Group, Inc., 945 So.2d 1246 (Fla. 2006), CPH argues that, where an intentional tort is proved, punitive damages are recoverable even in the absence of compensatory damages. We conclude that Ault is distinguishable and that Engle is not controlling in this case.
Ault was an assault and battery case. The jury in that case awarded the plaintiff punitive damages, but no compensatory damages. The Florida Supreme Court approved the punitive damages award because of the jury's express finding of liability. The court held that "a finding of liability alone will support an award of punitive damages `even in the absence of financial loss for which compensatory damages would be appropriate.'" 538 So.2d at 456. Assault and battery torts, however, are fundamentally different from fraud. Unlike in the case of fraud, actual injury or compensatory damages are not essential to stating a cause of action for assault and battery. See, e.g., Paul v. Holbrook, 696 So.2d 1311, 1312 (Fla. 5th DCA 1997); Lay v. Kremer, 411 So.2d 1347, 1349 (Fla. 1st DCA 1982).
It is fundamental that "[a]ctual damages and the measure thereof are essential as a matter of law in establishing a claim of fraud." Nat'l Equip. Rental, Ltd. v. Little Italy Rest. & Delicatessen, Inc., 362 So.2d 338, 339 (Fla. 4th DCA 1978). "Damage is of the very essence of an action for fraud or deceit." Casey v. Welch, 50 So.2d 124, 125 (Fla.1951). Without proof of actual damage the fraud is not actionable. Id.; Stokes v. Victory Land Co., 99 Fla. 795, 128 So. 408 (1930); Pryor v. Oak Ridge Dev. Corp., 97 Fla. 1085, 119 So. 326 (1928); Wheeler v. Baars, 33 Fla. 696, 15 So. 584 (1894); Nat'l Aircraft Servs., Inc. v. Aeroserv Int'l, Inc., 544 So.2d 1063 (Fla. 3d DCA 1989); Nat'l Equip. Rental, 362 So.2d at 339. Thus, to prevail in an action for fraud, a plaintiff must prove its actual loss or injury from acting in reliance on the false representation.[2]
Even if CPH established the fact of some unquantified damage (which theoretically could have supported a nominal damage award), this is not enough to justify a punitive damage award in a fraud case. Punitive damages for fraud cannot be based on nominal damages alone. Nat'l Aircraft Servs., 544 So.2d at 1065. Although the Florida Supreme Court's recent Engle opinion does state that "an *1133 award of compensatory damages is not a prerequisite to a finding of entitlement to punitive damages," we read the opinion as addressing the order of proof in determining entitlement to punitive damages. 945 So.2d at 1262 ("Therefore we conclude that the order of these determinations is not critical.").[3]
Accordingly, we reverse both the compensatory and punitive damage awards and remand this cause with directions to enter judgment for Morgan Stanley.
Reversed and Remanded.
SHAHOOD, J., concurs.
FARMER, J., dissents with opinion.
FARMER, J., dissenting.
I have a different perception.[4] Mine sees differences in the case actually litigated in the trial court from the case on appeal. In sum, I see nothing wrong under Florida law with Coleman's theory of compensatory damages or proof and would affirm that part of the judgment. As for punitive damages, however, I would reverse and remand for a new trial on the issue of entitlement[5] and, if necessary, the amount. I elaborate in the following paragraphs.

Compensatory Damages
Sunbeam sought to buy Coleman's stock to acquire control of the company. It agreed to pay part of the price with its own stock and part in cash. Coleman's reasons for accepting some of the price in the buyer's own securities were doubtlessly based on the tax laws, but there are other considerations as well. For example, one reason to hold the stock would be to receive future earnings from what was represented to be worth $640,000,000. And so the mere fact that part of the price was paid in securities hardly means that the seller intended to convert such securities into cash, or that buyer's damages should be based only on some hypothetical price the stock might have fetched if resold at some point.
The claim is intentional fraud, not breach of contract. Coleman claimed that Sunbeam and Morgan Stanley deliberately falsified financial reports to induce Coleman to accept Sunbeam stock as part of Sunbeam's acquisition of Coleman. That means that the worth of the stock is critical to measuring Coleman's damages.
The value of stock is affected by an objective factor, which in turn may be enhanced by subjective factors. Objectively, it reflects the intrinsic worth of the corporation: the value of its assets in excess *1134 of its liabilities. Its worth might also be enhanced by intangible factors: for example, although heavily in debt, a pending transaction could inject considerable profits.
Theoretically, there are two ways in which the value of the Sunbeam stock could have been falsified by the misrepresentations of Sunbeam and Morgan Stanley. The first would be that the stock really had no objective value at all because the corporation was insolvent and lacked any prospects to rescue it.[6] The alternative could be that the stock actually retained a value less than the corporate financial reports indicated. In other words, the distinction is the difference between zero and some positive whole number.
Florida law, therefore, understandably gave Coleman different ways to measure the injury it suffered from stock whose value had been deliberately misrepresented.
"Florida has adopted two standards for the measurement of damages in an action for fraudulent representation. Either may be used to do justice as the circumstances demand. The first standard is the `benefit-of-the-bargain' rule. . . . The second standard is the `out-of-pocket' rule. . . ." [e.s.]
See Martin v. Brown, 566 So.2d 890, 891 (Fla. 4th DCA 1990); see also Strickland v. Muir, 198 So.2d 49, 51 (Fla. 4th DCA 1967), receded from on other grounds, Teca, Inc. v. WM-TAB, Inc., 726 So.2d 828 (Fla. 4th DCA 1999). Looking at the benefit-of-the-bargain rule, I see nothing wrong with the jurisprudence of allowing the deceived victim of fraud to hold a defendant to his lies for purposes of assessing damages. So if a defendant had represented the thing to be worth $10,000 when it was actually worth nothing, it is fit and appropriate to mulct him in money damages for the full $10,000. Let the defendant pay what he said the value was. Essentially that is what the benefit-of-the-bargain theory of damages does.
At trial Coleman measured its damages by the benefit of its bargain. It did not seek to prove that the stock had some reduced value above zero. To the contrary, it contended instead that the stock was worthless. As I understand its evidence at trial if believed by the jury, it could have been properly understood as showing that the stock it received from Sunbeam and Morgan Stanley never really had any real value because of the concealed insolvency of Sunbeamas the later bankruptcy confirmed.
One important aspect of compensating someone for the intentional deceit of another is to make the damages fit the fraud and place the deceived person where he (it) would have been if the goods (stock) had been as represented. If Sunbeam and Morgan Stanley were guilty of deceiving Coleman into believing that the shares given in payment for the company were worth at least $640,000,000, even though the stock had no real value because of the corporation's concealed insolvency, then it seems only right to hold Sunbeam indebted to Coleman for the same $640,000,000 in money damages. Such compensation is just and fair because it vindicates the value (mis)represented.
I see no legal reason why the deceiver should be benefited in the measurement of damages by the mere fact that Coleman held on to the stock and refrained from *1135 selling it in the market when it might have done so. For one thing, by requiring a resale of inflated stock to an unsuspecting public, the court's reasoning would encourage aggrieved buyers unwittingly to make use of their seller's fraudulent representations concealing its real lack of value. The law of damages can hardly countenance such a perpetuation of fraudulent financial statements. If the tainted stock has no value, there is no reason for one in the position of Coleman to produce evidence of the selling price of the stock for any particular day after the sale and before the lawsuit so long as it instead proved that from the day of the sale it had no real value on account of the hidden financial failure of the company. Moreover, Coleman's failure to sell the stock at the first chance was obviously weighed by the jury. The verdict demonstrates that the jury apparently found that Coleman's failure to attempt resale was of no consequence.
At trial Morgan Stanley's damages defense was apparently meant to defeat Coleman's benefit-of-the-bargain theory by focusing on the second method of proving fraud damages. To reduce damages it sought to establish that even if the stock fell short of the entire value represented by the financial statements, it was nevertheless still worth some lesser value. Morgan Stanley certainly elicited evidence of a lesser value and so argued to the jury. The problem for Morgan Stanley on appeal is that its theory was substantially rejected by the jury. While there may have been contrary evidence, Coleman produced contrary evidence to support its theory of zero value. The jury relied on Coleman's theory instead of Morgan Stanley's, a reliance that should impel this court on appeal to reject the alternative theory of measuring damages as well.
The principal policy underlying compensation in fraud cases has been explained thus:
"In tort actions, the goal is to restore the injured party to the position it would have been in had the wrong not been committed. In most cases, the measure of damages which will accomplish this goal is that provided by the `out-of-pocket rule.' However, in some cases, the measure of damages afforded by that rule will prove inadequate to achieve the desired goal. To address those latter cases in which the claim is for fraud, what has been described as the `flexibility theory' has been developed. The `flexibility theory' permits the court to use either the `out-of-pocket' or the `benefit-of-the-bargain' rule, depending upon which is more likely fully to compensate the injured party." [c.o., e.s.]
Nordyne, Inc. v. Fla. Mobile Home Supply, Inc., 625 So.2d 1283, 1286 (Fla. 1st DCA 1993). Coleman had strong authority under Florida law to rely on the benefit-of-the-bargain rule and succeeded in producing evidence that the stock it received was essentially worthless. While Morgan Stanley was free to hitch its star to the alternative out-of-pocket rule, it was the function of the jury to decide which of the two theories would fully compensate the deceived victim of this particular fraud. From the amount awarded, it is obvious that the jury largely used the benefit-of-the-bargain rule, reducing the amount claimed by Coleman to fit the jury's resolution of the evidence. I do not think the trial judge abused her discretion in allowing the evidence or by refusing to disturb the jury's compensation verdict.

Punitive Damages
In Ault v. Lohr, 538 So.2d 454 (Fla. 1989), the court held that a plaintiff can recover punitive damages when the fact finder has found a breach of duty but compensatory or actual damages have not been proven; nominal damages need not *1136 first be awarded before punitive damages are proper. Yet in spite of Ault, the majority peremptorily holds that no punitive damages are possible in this intentional fraud case because of its reversal of the jury's award of compensatory damages. Their reasoning is:
"Although the Florida Supreme Court's recent Engle opinion does state that `an award of compensatory damages is not a prerequisite to a finding of entitlement to punitive damages,' we read the opinion as addressing the order of proof in determining entitlement to punitive damages, not as eliminating the need for proof of damages establishing the underlying case of fraud."
(referring to Engle v. Liggett Group, Inc., 945 So.2d 1246, 1262 (Fla.2006)). To understand why Engle does not hold what the majority said it did, I set out the Engle court's actual discussion on this subject in its entirety:
"A. Phase I Finding on Entitlement to Punitive Damages
"The last question on the Phase I verdict form asked the jury to determine whether `[u]nder the circumstances of this case, . . . the conduct of any Defendant rose to a level that would permit a potential award or entitlement to punitive damages.' The jury answered `yes' with respect to each of the defendants. In Phase II-B, the jury awarded a total of $145 billion in punitive damages to the class.
"The Third District ruled that the trial erred in awarding classwide punitive damages `without the necessary findings of liability and compensatory damages.' Engle II, 853 So.2d at 450.[[7]] A majority of the Court (Anstead, Pariente, Lewis and Quince) concludes that an award of compensatory damages is not a prerequisite to a finding of entitlement to punitive damages. Compensatory and punitive damages serve distinct purposes. As the United States Supreme Court has explained:
`The former are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct. The latter, which have been described as `quasi-criminal,' operate as `private fines' intended to punish the defendant and to deter future wrongdoing. A jury's assessment of the extent of a plaintiff's injury is essentially a factual determination, whereas its imposition of punitive damages is an expression of its moral condemnation. Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (citations omitted).'
"Because a finding of entitlement to punitive damages is not dependent on a finding that a plaintiff suffered a specific injury, an award of compensatory damages need not precede a determination of entitlement to punitive damages. Therefore, we conclude that the order of these determinations is not critical. See Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 474 (5th Cir.1986).
"A different majority of the Court (Wells, Anstead, Pariente and Bell) concludes that under our decision in Ault v. Lohr, 538 So.2d 454, 456 (Fla. 1989), a finding of liability is required before entitlement to punitive damages can be determined, and that liability is more than a breach of duty. A finding of liability necessarily precedes a determination of damages, but does not compel a compensatory award. For example, in Ault, the jury found that the defendant had committed an assault and *1137 battery but awarded $0 in compensatory damages and $5000 in punitive damages. See id. at 455. Thus, unlike the Phase I jury in this case, the jury in Ault found that the plaintiff had proved the underlying cause of action but did not suffer any compensable damage.
"Although we appeared to use `breach of duty' and `liability' interchangeably in Ault, the Court expressly adopted the principles set forth in dicta in Lassiter v. International Union of Operating Engineers, 349 So.2d 622 (Fla.1976). Specifically, we stated that
`[n]ominal damages are awarded to vindicate an invasion of one's legal rights where, although no physical or financial injury has been inflicted, the underlying cause of action has been proved to the satisfaction of a jury. Accordingly, the establishment of liability for a breach of duty will support an otherwise valid punitive damage award even in the absence of financial loss for which compensatory damages would be appropriate. Ault, 538 So.2d at 455 (quoting Lassiter, 349 So.2d at 625-26).'
"In this case, the Phase I verdict did not constitute a `finding of liability' under Ault. This is evidenced by the fact that had the jury found for Tobacco on the legal cause and reliance issues during Phase II, there would have been no opportunity for the jury to award the named plaintiffs damages of any type. In other words, Phase II findings for Tobacco on legal causation and reliance would have precluded the jury from awarding compensatory or punitive damages. It was error for the trial court to allow the jury to consider entitlement to punitive damages before the jury found that the plaintiffs had established causation and reliance.
"In Phase I, the jury decided issues related to Tobacco's conduct but did not consider whether any class members relied on Tobacco's misrepresentations or were injured by Tobacco's conduct. As the Third District noted, the Phase I jury `did not determine whether the defendants were liable to anyone.' Engle II, 853 So.2d at 450. It was therefore error for the Phase I jury to consider whether Tobacco was liable for punitive damages." [e.s.]
945 So.2d at 1262-63. By no stretch of the imagination could this explanation be understood by me as merely fixing an "order of proof in determining entitlement to punitive damages." Ault v. Lohr had already "eliminat[ed] the need for proof of damages establishing the underlying case of fraud," and Engle explicitly proceeded to follow and apply Ault in the holding quoted above. Id. It is not reasonable to read the above quotation to mean anything other than that an award of some compensatory damages is unnecessary to find an entitlement to punitive damages.
Because the majority's reading of Engle on the punitive damages issue is obviously at odds with the Supreme Court's earlier holding in Ault, it is apparent that the majority thinks that Engle has impliedly overruled Ault. But the Supreme Court has repeatedly made clear that it does not impliedly overrule itself. See Puryear v. State, 810 So.2d 901, 905 (Fla.2002) ("We take this opportunity to expressly state that this Court does not intentionally overrule itself sub silentio. Where a court encounters an express holding from this Court on a specific issue and a subsequent contrary dicta statement on the same specific issue, the court is to apply our express holding in the former decision until such time as this Court recedes from the express holding." [e.s.]); State v. Ruiz, 863 So.2d 1205, 1210 (Fla.2003) ("Further, as we have made clear, `this Court does *1138 not intentionally overrule itself sub silentio.'"); F.B. v. State, 852 So.2d 226, 228 (Fla.2003) ("Thus, while the Second District's reliance . . . is understandable, we again remind the courts that this Court does not intentionally overrule itself sub silentio."); City of Miami v. McGrath, 824 So.2d 143, 152 (Fla.2002) ("there is no indication that the Court . . . intended to recede from its prior approach to analyzing when a statute is an impermissible special law."). There is absolutely nothing in Engle suggesting that Ault was being explicitly overruled; indeed the court actually proceeded to apply Ault. See Engle, 945 So.2d at 1262-63 ("A finding of liability . . . does not compel a compensatory award. For example, in Ault, the jury found that the defendant had committed an assault and battery but awarded $0 in compensatory damages and $5000 in punitive damages. Thus, unlike the Phase I jury in this case, the jury in Ault found that the plaintiff had proved the underlying cause of action but did not suffer any compensable damage.").
Ault's actual holding is that zero compensatory damages do not preclude punitive damages. In fact the court granted review specifically to answer that question. Ault, 538 So.2d at 456 ("The narrow question for resolution by this Court is whether a plaintiff can recover punitive damages where the factfinder has found a breach of duty but no compensatory or actual damages have been proven."). In holding that liability without at least some compensatory damages does not foreclose an award of punitive damages, Ault explained:
"We believe an express finding of a breach of duty should be the critical factor in an award of punitive damages. Accordingly, we hold that a finding of liability alone will support an award of punitive damages `even in the absence of financial loss for which compensatory damages would be appropriate.' We reject Ault's contention that at least nominal damages must first be awarded before punitive damages are proper. We conclude that nominal damages are in effect zero damages and are defined as those damages flowing from the establishment of an invasion of a legal right where actual or compensatory damages have not been proven. In approving an award of punitive damages upon an express finding of liability by the factfinder, we accept the view that nominal damages will be presumed from an encroachment upon an established right." [e.s., f.o.]
Id. In a special concurring opinion, Justice Ehrlich contributed the following:
"The crucial element in determining whether punitive damages may be awarded absent an award of compensatory damages is proof of the underlying cause of action. Where actual damage is an essential element of the underlying cause of action, an award of compensatory damages must be a prerequisite to an award of punitive damages. This case involved the torts of assault and battery, which do not require proof of actual damage. Therefore, I agree that in this case, where the jury made an express finding of liability, punitive damages could properly be awarded even absent an award of compensatory damages."
538 So.2d at 457.
The majority has not disturbed the jury's finding of liability for fraudfor which plaintiff was required to present evidence of the fact (if not the amount) of some damage. Effectually the majority has resurrected this court's holding in Buonopane v. Fritz, 477 So.2d 1030 (Fla. 4th DCA 1985) ("The law in Florida is clear that one cannot recover for punitive damages if no compensatory damages are awarded."). But that holding that was *1139 expressly disapproved in Ault. 538 So.2d at 456 ("For the reasons expressed, we . . . disapprove Buonopane v. Fritz, 477 So.2d 1030 (Fla. 4th DCA 1985). . . ."). There is a world of difference between the fact that one was damagedi.e., harmed or injuredby a falsehood (fraud being merely one example of an actionable falsehood, defamation another) and the entirely separate issue of its quantification in money damages. Ault requires only the former and eschews the latter.
In setting aside the compensatory damages in this case, the majority's premise is that the stock may well have had some lesser value than Morgan Stanley represented but the evidence fails to establish that any precise lesser value on some relevant date. Clearly, however, the evidence supported the inference that Coleman was damaged by the fraud, even if it fails to support the precise amount awarded. In First Interstate Development Corp. v. Ablanedo, 511 So.2d 536 (Fla.1987), the supreme court held that punitive damages are appropriate for any tortious conduct accomplished through fraud. See also Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So. 214, 221, 222 (1936) (exemplary damages are given solely as a punishment where torts are committed with fraud; to recover exemplary or punitive damages, the declaration must allege some general facts and circumstances of fraud). If proof of intentional fraud is per se enough for punitive damages, then the failure to establish the precise monetary amount of the actual loss caused by the fraud does not affect the entitlement to punitive damages. It may have an effect on the amount of punitive damages but not entitlement.
In order for the jury in this case to have assessed any compensatory damages, it first had to decide that Coleman had established the fact of damage from Morgan Stanley's intentionally false financial statements. Accordingly, under Engle and Ault, if the majority could properly decide that Coleman failed to prove any amount of compensatory damages, it would be necessary to presume at least nominal damages for fraud. The result should then be to remand the case to the trial court for a new trial on punitive damages.
But apart from Engle, I think a new trial on punitive entitlement is required for an entirely different reason. My reasoning is this.
Liability on the fraud issue was partially established by the trial court's imposition of sanctions on Morgan Stanley and its consequent jury instruction that it must take as established the essential facts Coleman relied on to prove liability for fraud. Later when this bifurcated trial entered the punitive damages phase, Morgan Stanley tried to present evidence contrary to those facts deemed established by the jury instruction for purposes of deciding the liability phase. The trial judge barred Morgan Stanley from doing so. In my opinion, this was error.
In deciding whether to inflict civil punishment by punitive damages, the critical issue turns on "the degree of reprehensibility[[8]] of the defendant's misconduct." State Farm Mutual Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); BMW of North America, Inc. v. Gore, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). While there are other lesser factors, it is manifest that any "moral outrage" of the jury must arise from conduct suitably blameworthy. See e.g. Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) ("A jury's . . . imposition of punitive damages is an expression *1140 of its moral condemnation."). The moral condemnation is the censure of a civil society expressed collectively by its representative members on a jury. It is not the individual reaction of a single judgenot even when the judge is imposing sanctions for discovery violations by directing the jury to take certain facts as proven. The facts creating an entitlement to punitive damages are not something that a trial judge can impose on a jury as a presumption. Unavoidably, it is the jury who must find and express that moral condemnation.
A jury cannot make this severe condemnation without admissible evidence confirming that the defendant's conduct was adequately blameworthy. Due process thus requires that defendant must necessarily have the right to offer admissible evidence that members of the community might logically and reasonably consider as mitigating its blameworthiness for such punishment. In this case the trial judge essentially denied Morgan Stanley that right. For that reason I would have a new trial as to both entitlement and (if necessary) any amount.
NOTES
[1] CPH's argument on appeal that the jury actually awarded it $600 million in "consequential" damages is unpersuasive. The jury was not instructed on the concept of consequential damages. In any event, CPH's new theory is not supported by the authorities it cites.
[2] In his specially concurring opinion in Ault, Chief Justice Ehrlich observed that if actual damage is an essential element of a tort, then an award of compensatory damages is necessary for an award of punitive damages. Though we recognize that this concurring opinion is not binding precedent, we find it highly persuasive. The alternative view would, for example, permit virtually anyone who ever smoked a cigarette in the State of Florida to recover punitive damages in a fraud action against the tobacco companies, irrespective of a finding of any actual adverse health effects.
[3] Even if we were to accept CPH's argument that some amount of punitive damages would still be awardable after a directed verdict on compensatory damages, due process principles would not have permitted an $850 million punitive damage award to stand in a case where no compensatory damages were awarded. See BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (holding that punitive damages must bear a reasonable relationship to compensatory damages). Under due process principles, only a small fraction of the $850 million award would conceivably have been recoverable in this situation.
[4] I do agree with the majority's necessarily implicit affirmance of the trial court's application of Florida law instead of New York. Florida has a significant and undeniable interest in providing remedies for persons injured by false financial statements emanating from this state by companies who have decided to locate their headquarters here. I agree that the trial court did not abuse its discretion in the sanctions imposed on Morgan Stanley for substantial violations of court orders.
[5] See § 768.725, Fla. Stat. (2005) ("In all civil actions, the plaintiff must establish at trial, by clear and convincing evidence, its entitlement to an award of punitive damages.").
[6] Again, even if the stock lacked objective value because of the insolvency of the corporation, the owners of its stock might still avoid a liquidation if they could point to some prospective advantage to conceivably rescue the situation. But without that, the stock would have no value.
[7] Liggett Group, Inc. v. Engle, 853 So.2d 434, 450 (Fla. 3d DCA 2003).
[8] Some synonyms are blameworthy, unpardonable, evil, wicked, iniquitous.